1          UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF TENNESSEE
2                COOKEVILLE DIVISION

3

4   UNITED STATES OF AMERICA      )
                                  )
5   VS                            )   No. 3:24-mj-1036
                                  )        2:24-cr-0002
6   PAUL FAYE, SR.                )
    ─────────────────────────────────────────────────
7

8        BEFORE THE HONORABLE JEFFERY S. FRENSLEY,

9                   MAGISTRATE JUDGE

10       **TRANSCRIPT OF ELECTRONIC RECORDING**

11                 February 12, 2024

12  ─────────────────────────────────────────────────

13  APPEARANCES:

14  For the Government:      JOSHUA KURTZMAN
                             U.S. Attorney's Office
15                           719 Church Street, Ste 3300
                             Nashville, TN 37203
16

17  For the Defendant:       R. DAVID BAKER
                             Federal Public Defender's Office
18                           810 Broadway, Ste 200
                             Nashville, TN 37203
19

20
    ─────────────────────────────────────────────────
21  PREPARED FROM **ELECTRONIC RECORDING** BY:

22  **Roxann Harkins, RPR, CRR**
    Official Court Reporter
23  719 Church Street, Ste 2300
    Nashville, TN 37203
24  615.403.8314
    roxann_harkins@tnmd.uscourts.gov
25

# I N D E X

Government witness

**CHRISTOPHER POTTS**

Direct Examination By Mr. Kurtzman ...................4
Cross-Examination By Mr. Baker ....................21
Redirect Examination By Mr. Kurtzman ..............43
Recross-Examination By Mr. Baker ..................52

Defense witnesses

**TIFFANY LUEBKE**

Direct Examination By Mr. Baker ...................56
Cross-Examination By Mr. Kurtzman .................73

**JESSE LUEBKE**

Direct Examination By Mr. Baker ...................79
Cross-Examination By Mr. Kurtzman .................86

**RITA PEPPER**

Direct Examination By Mr. Baker ...................91
Cross-Examination By Mr. Kurtzman .................99
Redirect Examination By Mr. Baker ................105

# E X H I B I T S

Government No. 1....Device determination document ..8
Government No. 2....Line Sheet (SEALED) ...........17
Government No. 3....Audio recording ...............18

1

2      The above-styled cause came to be heard on

3  February 12, 2024, before the Hon. Jeffery S. Frensley,

4  Magistrate Judge, when the following proceedings were had

5  to-wit:

6              **TRANSCRIPT OF ELECTRONIC RECORDING**

7                        **\*\*\***

8

9      THE COURT:  Good afternoon, everyone.

10  Welcome.  We're here this afternoon in the matter of the

11  United States of America versus Paul Faye.  It's Case

12  No. 24-mj-1036.  Mr. Faye is present in court this

13  afternoon along with his attorney, Mr. Baker.

14  Mr. Kurtzman's here for the United States.

15      We've set the matter today for a preliminary

16  hearing and detention hearing.  Mr. Kurtzman, is the

17  government ready to go forward and are there any

18  announcements before we get started?

19      MR. KURTZMAN:  I don't think there's any

20  announcements, Your Honor.  And we are ready to go

21  forward.

22      THE COURT:  All right, very good.

23      Mr. Baker, are you ready and any

24  announcements?

25      MR. BAKER:  We're ready, Your Honor.  No

1  announcements.

2              THE COURT:  All right.  Very good.

3  Mr. Kurtzman, how you would like to proceed?

4              MR. KURTZMAN:  Your Honor, the government

5  will call FBI Special Agent Chris Potts.

6              THE COURT:  All right.  Special Agent Potts,

7  if you'd step up and be sworn.

8                       **CHRISTOPHER POTTS**

9  called as a witness, after having been first duly sworn,

10  testified as follows:

11              COURTROOM DEPUTY:  Could you state your name

12  for the record and spell your last name.

13              THE WITNESS:  Special Agent Christopher

14  Potts, P-o-t-t-s.

15              COURTROOM DEPUTY:  Thank you so much.

16  Please have a seat.

17              THE COURT:  You may ask.

18                       **DIRECT EXAMINATION**

19  BY MR. KURTZMAN:

20      Q.    Agent Potts, where are you currently

21  employed?

22      A.    Currently employed with the FBI out of the

23  Memphis Field Office, Nashville Resident Agency.

24      Q.    What's your role as an FBI agent?

25      A.    I'm currently assigned to the Joint

1    Terrorism Task Force here in Nashville where part of my
2    responsibilities are to investigate federal criminal
3    violations revolving around terrorism or other -- other
4    acts involving firearms, criminal violations involving
5    firearms.
6         Q.    Okay.  And were you involved in the
7    investigation into Paul Faye?
8         A.    Yes, I was.
9         Q.    And have you reviewed the affidavit that was
10   signed by Agent DeFeo?
11        A.    Yes, I have.
12        Q.    Are you familiar with the facts in there?
13        A.    Yes.
14        Q.    And that familiarity comes from preparing
15   for this hearing, as well as your personal involvement in
16   the investigation?
17        A.    Yes, that's correct.
18        Q.    Can you adopt the statements contained in
19   Agent DeFeo's affidavit as your testimony here today?
20        A.    Yes, I do.
21        Q.    In the affidavit there was discussion of a
22   suppressor.  Are you familiar with that portion of the
23   investigation?
24        A.    Yes.
25        Q.    Can you describe how -- can you describe

1  that portion of the investigation?

2       A.     So in December -- well, I'm sorry.  Let me

3  back up.  In April of 2023, an FBI undercover had

4  conducted an in-person meeting with Mr. Faye.  During

5  that -- during that meeting, the FBI undercover observed

6  a photograph of a suppressor attached or affixed to the

7  front end of a rifle on Mr. Faye's cell phone.

8            Then in December of 2023 Mr. Faye indicated

9  to the FBI undercover that he could and would provide the

10  suppressor to him at a later date.  Then in January of

11  2024 Mr. Faye did sell the suppressor that we're

12  referring to to the FBI undercover for $100.

13       Q.     And did Mr. Faye ever state whether or not

14  there was a tax stamp on the suppressor?

15       A.     He actually indicated that there was not a

16  tax stamp on the suppressor.

17       Q.     Based on your knowledge and experience, what

18  did you conclude that Mr. Faye meant when he said there

19  wasn't a tax stamp on there?

20       A.     Based on my training and experience,

21  Mr. Faye saying that there was not a tax stamp was him

22  alluding to the fact that it was not a known firearm or

23  suppressor that would have been required to be registered

24  on the National Firearms Registration and Transaction

25  Record or NFRTR, and that it would essentially be hidden

1    or secret from known -- being known to the US government.

2          Q.    Okay.  And so suppressors and other

3    particular weapons have to be registered on this NFRTR?

4          A.    Yes, that's correct.

5          Q.    And did -- you mentioned, was a search run

6    of Mr. Faye to see if he had any firearms on the National

7    Firearms Registration and Transfer Record?

8          A.    Yes.  The FBI on two occasions checked the

9    NFRTR to determine whether Mr. Faye had registered any

10   firearms or suppressors, and on both occasions those

11   checks came back negative.  So he did not -- or had not

12   at the time, when the checks were made, registered any of

13   those.

14         Q.    And that's a requirement to possess a

15   suppressor?

16         A.    That's correct.

17         Q.    I'm going to pass you what's been marked as

18   Government's Exhibit 1.  Are you familiar with that

19   document?

20         A.    Yes, I am.

21         Q.    And, now, another report.  You did not

22   personally prepare this report; correct?

23         A.    No, I did not.

24         Q.    Was the suppressor submitted to the ATF for

25   testing?

1          A.    Yes, it was.

2          Q.    And did they determine whether or not what

3    Mr. Faye transferred to that undercover FBI agent was, in

4    fact, a firearm suppressor?

5          A.    Yes, based on the conclusion in this -- in

6    this report, they did determine that it was required to

7    be registered on the NS -- I'm sorry, the NFRTR.

8               MR. KURTZMAN:  Your Honor, the government

9    would move to admit Exhibit 1 into evidence.

10               THE COURT:  You've seen it, right,

11    Mr. Baker?

12               MR. BAKER:  Yes, Your Honor.

13               THE COURT:  It will be admitted.

14               (Government Exhibit No. 1 was admitted.)

15    BY MR. KURTZMAN:

16          Q.    And in that document the ATF actually talks

17    about how they tested it to ensure that it did, in fact,

18    function as a suppressor?

19          A.    Yes.

20          Q.    I want to go back a little bit.  How did --

21    were you also involved in an investigation involving

22    individuals that we'll just refer to right now as Perry

23    and Odell?

24          A.    Yes, I was.

25          Q.    Can you describe that investigation?

1          A.     So Mr. -- Mr. Odell and Mr. Perry were both

2     FBI subjects.  In October of 2022 -- I'm sorry -- yeah,

3     October of 2022, the FBI conducted a -- or executed a

4     search warrant at the residence belonging to Mr. Odell.

5     Mr. Perry, who was from the Clarksville, Tennessee, area

6     was also there at the time.

7               During the execution of that search warrant,

8     the two cell phones or -- or -- were -- basically were

9     taken or seized from that.  And during the subsequent

10    review of Mr. Perry's cell phone, private social media

11    messages were observed between Mr. Perry and Mr. Faye.

12         Q.     And what happened of significance during the

13    execution of that search warrant at -- did you say

14    Mr. Odell's home?

15         A.     Yes, it was at Mr. Odell's home.

16         Q.     What happened when the FBI approached

17    Mr. Odell's home?

18         A.     So as the FBI agents approached the property

19    in order to execute that search warrant, Mr. Perry

20    exited -- well, at one point used a rifle to shoot

21    through the window of the residence at the FBI agents who

22    were coming onto the property and continued to do so and

23    shot multiple rounds at the agents.

24         Q.     And how did Mr. Perry and Mr. Odell -- you

25    said they were FBI subjects.  How did they come to the

1 FBI's attention prompting the investigation and the

2 search warrant you just described?

3      A.    So initially the FBI observed -- observed

4 messages, threatening messages that would have been

5 posted on social media by Mr. Perry, indicating that he,

6 along with potentially others, intended to go down to the

7 US/Mexico border and possibly commit acts of violence

8 while they were there.

9      Q.    Okay.  And then you said once those phones

10 were searched after the execution of that search

11 warrant -- and the search of Mr. Odell's home -- you said

12 Mr. Perry is a Clarksville resident.  Mr. Odell is a

13 resident of Missouri; is that right?

14      A.    Yes, sir.

15      Q.    Okay.  During the course of the

16 investigation into Mr. Perry and Odell, did the FBI come

17 to believe that they were going to return to Tennessee

18 prior to going to the border?

19      A.    Yeah.  So the FBI had observed -- had

20 observed messages or indications that there were -- there

21 were more than just Mr. Odell and Mr. Perry who were part

22 of a group who intended to go down to the border.  At the

23 time there was an unknown -- there was an unknown

24 individual or maybe possibly multiple individuals in

25 Tennessee who we didn't know the identity of.  But upon

1    reviewing Mr. Perry's cell phone, that's when the FBI
2    became aware that Mr. Paul Faye was at least one of the
3    members in Tennessee who was part of that group.
4          Q.    And during the search of that phone, did the
5    FBI recover evidence that Mr. Perry and Odell had
6    actually met Mr. Faye at his property?
7          A.    Yes, there were -- on at least one occasion
8    they had met -- met here in Tennessee.
9          Q.    Okay.  And you said that Perry and Odell
10   were planning to commit acts of violence at the border.
11   Who specifically -- or what groups of people did they
12   plan to target if they had made it to the border?
13         A.    They had expressed plans to possibly commit
14   acts of violence towards migrants who were crossing the
15   border in from Mexico.
16         Q.    Was there a discussion of targeting law
17   enforcement as well?
18         A.    Yes, there were.  Border Patrol or other
19   federal officials in particular.
20         Q.    And then once Faye was identified through
21   the search of Mr. Perry and Odell's phone, what did the
22   FBI do to attempt to determine whether he was, in fact,
23   involved with that plan or was planning on committing
24   acts of violence?
25         A.    So in March of 2023, the FBI introduced an

1   undercover employee to Mr. Faye via TikTok.  The

2   communications occurred there for a period of time, and

3   then at some -- at one point Mr. Faye provided his

4   personal cell phone number to the FBI undercover.  And

5   then in April of 2023 the FBI's undercover started --

6   started having in-person meetings and continuing phone

7   conversations with Mr. Faye.

8       Q.   Okay.  And it's referenced in the criminal

9   complaint, but do you recall the undercover reporting

10  that Mr. Faye said to him that once they got to the

11  border that he would be able to find some tactical gear

12  lying around on the ground?

13      A.   Yes.

14      Q.   Okay.  And what did you as an FBI agent,

15  what did that lead you to think he was talking about?

16      A.   So based on my training and experience, it

17  was -- it was likely that that gear would have belonged

18  to somebody else at some point, possibly deceased

19  individuals who had been killed during some type of

20  confrontation.

21      Q.   And gear, he was talking about tactical

22  vests and other things that would be useful --

23      A.   Right.

24      Q.   -- is that correct?

25      A.   Yes.

1      Q.     In August of 2023, the undercover relayed --

2 and it's included in the complaint which you said you're

3 familiar with, that Mr. Faye said he was gathering things

4 that go boom, boom, boom.  Do you recall seeing that?

5      A.     Yes, I do.

6      Q.     And based on your experience as an FBI

7 agent, what did you conclude after you saw that?

8      A.     Based on my experience, I concluded that he

9 was talking about either explosives of some type or

10 bullets that were being shot from a gun.

11      Q.     And in November of last year, are you

12 familiar with the defendant informing the undercover

13 about his communications with a man by the name of Greg

14 Gibson?

15      A.     Yes.

16      Q.     Can you describe that?

17      A.     So there was a conversation with Mr. Gibson

18 at some point.

19      Q.     And who is Mr. Gibson?

20      A.     Mr. Gibson resides in North Carolina.

21      Q.     And what were -- not exactly, but what were

22 the discussions between Mr. Gibson and Mr. Faye about?

23      A.     So they discussed travel down to the

24 US/Mexico border as well.

25      Q.     And was Mr. Gibson attempting to organize

1   individuals to go to the border?

2        A.    Yes, he was.  There were reports at one

3   point that a large amount of individuals were part of a

4   group who were planning on going down to the border.

5        Q.    Are you familiar with a multistate meeting

6   of individuals organized by Mr. Gibson?

7        A.    No, I can't -- I can't say I am.

8        Q.    Okay.  Did you review the recorded

9   conversation between Mr. Faye and the undercover from

10  December 14 of 2023?

11       A.    Yes, I did.

12       Q.    And what were the contents of that

13  communication between Mr. Faye and the undercover?

14       A.    So in that December 2023 recorded

15  conversation, Mr. Faye indicated that -- that he, as part

16  of his group, that he kind of likened himself to be --

17  have a sniper role based on a specific skill set that he

18  had.

19       Q.    And did he indicate whether or not he

20  planned on shooting individuals when they got to the

21  border?

22       A.    Yes, he -- he -- in his -- in his way of

23  thinking, it was that he envisioned being on a rooftop

24  someplace and kind of in an overwatch sort of situation

25  where he could take out anybody -- any potential threats

1    or individuals that would be in an area and kind of

2    protect -- provide protection for his group before they

3    stepped foot into the area.

4         Q.    And do you recall Mr. Faye mentioning

5    Tannerite and Claymore mines during that conversation?

6         A.    Yes.

7         Q.    And what was the discussion involving about

8    with Tannerite and Claymore mines?

9         A.    The discussion just said that there were --

10   they had access to Tannerite or someone had access to

11   Tannerite or Claymore mines, that could be used as well.

12        Q.    And what do you understand a Claymore mine

13   to be?

14        A.    Claymore mine would be used as an explosive

15   to potentially injure or kill, you know, a group of

16   people or an individual at the same time.

17        Q.    And then you already mentioned that the

18   suppressor/silencer was exchanged on January 11, 2024?

19        A.    Yes.

20        Q.    And are you familiar with Mr. Faye's vehicle

21   situation in January of 2024?

22        A.    Yes.

23        Q.    What was that situation?

24        A.    So I'm aware that he had been in some kind

25   of a vehicle accident to the point where his truck was

1   not operable at the time, so he didn't have -- he was

2   driving a rental car.

3        Q.    And did Mr. Faye indicate to the undercover

4   or anyone else that once his vehicle was fixed he planned

5   to travel to the border?

6        A.    Yes.  He said he was waiting for the truck

7   to be fixed so that then he could go so he could carry

8   his stuff.

9        Q.    Because he -- did he indicate whether or not

10  he planned to take firearms or anything else to the

11  border?

12       A.    Yes.

13       Q.    What did he indicate that he was going to

14  take?

15       A.    That he would take firearms, ammunition and

16  other tactical gear.

17       Q.    Pass you Government's Exhibit 2.  Are you

18  familiar with the line sheet from January 22 of 2024?

19       A.    Yes, I am.

20       Q.    And have you reviewed that in preparation

21  for your testimony here today?

22       A.    Yes.

23            MR. KURTZMAN:  Your Honor, the government

24  would move to admit Exhibit 2.

25            THE COURT:  It will be admitted.

1              (Government Exhibit No. 2 was admitted under

2      seal.)

3      BY MR. KURTZMAN:

4           Q.    Agent Potts, I'd like you to turn to page 3,

5      the top of page 3, and read those first two text

6      messages.

7           A.    All right.  Top of page 3 says:  Hey, buddy,

8      sorry for the late response.  The feds have me absolutely

9      smoothed.  If we had a few thousand, we could make a

10     stand, hold them back for the moment.

11              The second message says:  Calling our

12     contact from Texas Rangers and the Maverick County

13     Sheriff's Office tomorrow to see if we can get a sitdown.

14     If not, we will likely have to fall back.

15          Q.    And do you know who the text messages -- the

16     text messages from Mr. -- with Mr. Faye are with in these

17     two instances?

18          A.    Off the top of my head, I don't.  I do not

19     know.  I have to review the phone number.

20          Q.    In January of 2024, do you know whether or

21     not Greg Gibson actually went to the US/Mexico border?

22          A.    He did go to the US/Mexico border.

23          Q.    Okay.  And as you continue through that,

24     have you reviewed the phone call that is summarized

25     beginning on page 19 and continuing on through page 23?

1          A.    Yes, I have.

2          Q.    And have you actually had a chance to listen

3    to that as well?

4          A.    Yes.

5                MR. KURTZMAN:  Your Honor, the government

6    would move to admit Exhibit No. 3 into the record, which

7    is a recording.  I've got a copy on disk here for the

8    Court.

9                THE COURT:  All right.

10               (Government Exhibit No. 3 was admitted.)

11   BY MR. KURTZMAN:

12         Q.    (Playing audio.)

13               Agent Potts, are you aware of whether or not

14   the FBI had physical surveillance of Mr. Faye on

15   January 22, 2024?

16         A.    Yeah.  The FBI did not have surveillance on

17   him that day up there.

18         Q.    (Playing audio.)

19               Agent Potts, during that recording Mr. Faye

20   is talking about being in communication with a Greg.  Do

21   you assume that is Greg Gibson?

22         A.    Yes.

23         Q.    (Playing audio.)

24               Agent Potts, when Mr. Faye says he's going

25   to put them down, did you -- what did you conclude or who

1  did you conclude that he was talking about in that

2  statement?

3         A.    My conclusion was that he intended to kill

4  the FBI agents that were going to come for him.

5         Q.    (Playing audio.)

6               Agent Potts, during the investigation, do

7  you know whether or not after Perry and Odell were

8  arrested whether or not Mr. Faye continued to communicate

9  with either of them?

10        A.    Yes, I know there was some jail calls that

11 were -- we reviewed between Mr. Perry and Mr. Faye.

12        Q.    And in that -- in those jail calls, did

13 Mr. Perry and Mr. Faye discuss whether they thought

14 someone had been involved in turning -- getting them

15 turned in?

16        A.    Yes, I think so.

17        Q.    Okay.  Did they conclude that Mr. Odell was

18 a federal agent in the beginning?

19        A.    Yes, they thought so.

20        Q.    And he was not a federal agent; correct?

21        A.    No, he wasn't.

22        Q.    Okay.  Agent Potts, the call we just

23 listened to occurred on January 22 of this year.  Did the

24 FBI begin making plans to arrest Mr. Faye after that?

25        A.    Yes, we did.

1      Q.    And why at that point did the FBI say that
2    they -- it was time to make an arrest?
3      A.    Just based on a call like we just listened
4    to, it seemed like the -- his -- the rhetoric coming from
5    Mr. Faye in terms of what his plans and potential violent
6    actions that might occur, whether it be at the border or
7    to federal agents, that things had changed a little bit
8    and maybe now it was time to take down the investigation.
9      Q.    And where did the FBI eventually arrest the
10   defendant?
11     A.    We arrested him at the Davidson County
12   courthouse on February 5.
13     Q.    How did you come to -- how did the FBI know
14   that he would be there that day?
15     A.    We knew that -- actually, he had mentioned
16   it on multiple calls and also we checked with the county
17   courthouse and found out that he had a state court
18   hearing that day.
19     Q.    Okay.  And why did the FBI decide to arrest
20   him that way rather than go to his property?
21     A.    Yeah.  So based on the things that he said,
22   like, in the call, from an officer safety perspective, it
23   made more sense to -- to arrest him after he had gone
24   through a metal detector when he went in for his hearing
25   so we knew he wouldn't have any weapons on him.  Based on

1   some of the things that he said to the FBI undercover,

2   just indicating that he would not be peaceful towards FBI

3   agents when we approached him at his house.

4           Q.    And he had a number of firearms at his

5   house; correct?

6           A.    Yes, he did.

7           Q.    And that was -- was a search warrant done of

8   his house?

9           A.    Yes.

10          Q.    Did that search warrant lead to the recovery

11  of numerous firearms?

12          A.    Yes, it did.

13          Q.    Did it lead to the recovery of rifle scopes

14  used for long-range shooting?

15          A.    Yes, there were a couple.

16               MR. KURTZMAN:  No further questions.

17               MR. BAKER:  One moment please, Your Honor.

18                        **CROSS-EXAMINATION**

19  BY MR. BAKER:

20          Q.    Good afternoon, Agent Potts.

21          A.    Good afternoon.

22          Q.    Nice to see you.

23               THE COURT:  Mr. Baker, there's also a notch

24  on the left-hand side, make it --

25               MR. BAKER:  Maybe it will be stable.  There

1    we go.  Thank you, Your Honor.

2                    THE COURT:  You're welcome.

3    BY MR. BAKER:

4         Q.    Okay, Agent Potts.  I have a few questions

5    for you.  What was your personal involvement in this

6    case?

7         A.    I assisted as a co-case agent.

8         Q.    Well, when did you first get involved in the

9    case?

10        A.    In general from the very beginning.

11        Q.    Okay.  So would that be in March of 2023?

12        A.    Yes.

13        Q.    Okay.  You were not involved in the case

14   prior to that; right?

15        A.    I was involved in an investigation involving

16   Mr. Perry.

17        Q.    Oh, you were.  Okay.

18        A.    Yeah.

19        Q.    So Mr. Perry was arrested in October of

20   2022; correct?

21        A.    Yes.

22        Q.    Okay.  So that is at least six months prior

23   to your investigation of Mr. Faye; is that right?

24        A.    Approximately, yeah.

25        Q.    Okay.  Was it around March when it was

1  discovered that Mr. Perry had had communications with

2  Mr. Faye?

3       A.    I believe that the review of the phones,

4  which were seized during that search warrant happened

5  earlier than that.

6       Q.    Okay.  Well, why was the investigation not

7  started into Mr. Faye until March then?

8       A.    The way I understand it, like, it does take

9  time to properly identify who Mr. Faye was, so there

10 was -- certain checks were -- needed to be made so we

11 could properly identify the right person to make sure we

12 weren't opening an investigation on the wrong individual.

13      Q.    Okay.  Now, Paul Faye is from Tennessee;

14 correct?

15      A.    I don't think he's from Tennessee.  That's

16 where he was resided when the investigation opened.

17      Q.    He'd lived in Tennessee at that point?

18      A.    Yes.

19      Q.    Okay.  But he's arrested and charged in the

20 Western District of Missouri.

21      A.    Mr. Faye?

22      Q.    I mean -- I'm sorry.  Is Mr. Perry from

23 Tennessee?

24      A.    I don't know if he's from Tennessee, but he

25 was residing in the Tennessee area when we first became

1  aware of him, yeah.

2         Q.    Okay.  So Mr. Perry -- I may have said Faye.

3  Mr. Perry is charged in the Western District of Missouri?

4         A.    Yes.

5         Q.    Along with another individual?

6         A.    Correct.

7         Q.    Okay.  You said that Perry came a couple of

8  times to visit with Mr. Faye?  Or one time?

9         A.    I know that Mr. Odell came at least once and

10  met with Mr. Perry and Mr. Faye while they were here in

11  Tennessee.

12         Q.    Okay.  And Mr. Odell is the one charged with

13  Perry in Missouri?

14         A.    That's correct.

15         Q.    Now, is there any recording or proof about

16  what happened in the meetings between -- or the meeting

17  between Mr. Perry and Mr. Odell and Mr. Faye?

18         A.    The FBI was not recording conversations

19  during those -- during that time.

20         Q.    So we don't know what transpired between

21  them?

22         A.    No, not -- not from my -- my awareness.

23         Q.    Has Perry or Odell given a statement as to

24  what happened in those meetings?

25         A.    So the FBI was aware that there was another

1   individual from Tennessee that Mr. Perry and Mr. Odell --
2   who -- that they were going to meet up with to go down to
3   the border.  At that time in October of 2022 and the
4   summer of 2022 we didn't know who that -- who that
5   individual was or who -- maybe if there were multiple
6   individuals.
7           Q.    How do you know they were going to meet up
8   to go to the border then?
9           A.    Based on -- it was based on commentary that
10  were made on social media and through source reporting.
11          Q.    By who?  Who made the commentary on social
12  media that Mr. Faye --
13          A.    Mr. Perry, a review of his TikTok messages
14  and videos that he posted on TikTok.
15          Q.    Did he say Mr. Faye was going to the border
16  with him in those messages?
17          A.    No.
18          Q.    Okay.  He said he was going to the border.
19          A.    He said he had a group --
20          Q.    Okay.
21          A.    -- of people.
22          Q.    Did he identify who was in the group?
23          A.    Not in those -- in those messages but that
24  they were part of a group called the Second American
25  Militia.

1      Q.    What more do you know about the Second

2 American Militia?

3      A.    So that they're a loosely affiliated group

4 of individuals that Mr. Odell, Mr. Perry and Mr. Faye was

5 a part of.

6      Q.    What is your source of information that

7 Mr. Faye was a part of that?

8      A.    That -- I know that he had -- I conducted an

9 interview of Mr. Faye when he was arrested.  During

10 that -- during that interview he indicated that his --

11 that Mr. Perry, whom he had met with, provided him with a

12 patch that was for that -- for that group.

13      Q.    He told you that on the day of his arrest?

14      A.    Yes.

15      Q.    Okay.  Did you write a report that

16 summarizes that?

17      A.    I co-authored a report.

18      MR. BAKER:  Do you have that report, Josh?

19      MR. KURTZMAN:  (indiscernible).

20      MR. BAKER:  Okay.

21 BY MR. BAKER:

22      Q.    So what did he tell you on the day of his

23 arrest about Perry?

24      A.    He said that he had met with -- that he

25 knew -- he knew who Bryan was.  I don't think -- at the

1   time during the interview, he said he didn't know any

2   last names, but that there was an individual named Bryan

3   who I took to mean Bryan Perry. And that Bryan had made

4   a patch and had given him one as part of -- as part of

5   the -- as part of the group.

6       Q.   Okay. Well, did he also tell you that they

7   told Bryan Perry to stay away from their meetings?

8       A.   That didn't come up, no.

9       Q.   Were you aware that Mr. Faye and his sons

10   and others had a group that would meet to go camping and

11   shoot firearms and talk about basically survivalist

12   stuff, how we would live off the land if there was some

13   type of war or problem that went on?

14       A.   No.

15       Q.   You haven't heard about that?

16       A.   No.

17       Q.   Have you interviewed his sons?

18       A.   I personally have not.

19       Q.   Have anybody else in the government

20   interviewed his sons?

21       A.   I think there was some conversation between

22   the sons and the agent during the execution of the search

23   warrant at Mr. Faye's property.

24       Q.   Okay. Now, you talked about the -- what's

25   being called a suppressor that you testified that

1     Mr. Faye sold to an agent. You weren't present for that;

2     correct?

3         A.     I was not.

4         Q.     In fact, you're not present for any of the

5     meetings and conversations that are described in the

6     complaint?

7         A.     Correct.

8         Q.     This was prepared by another agent, so you

9     weren't there for any of this stuff?

10        A.     No, I wasn't.

11        Q.     So you don't have any way of personally

12     knowing whether this stuff is accurate?

13        A.     No.

14        Q.     Were you -- did you learn that both Mr. Faye

15     and his son told Bryan Perry that he wasn't welcome, that

16     he should get out of there?

17        A.     No, I was not aware of that --

18        Q.     You're not aware of that?

19        A.     -- conversation occurring.

20        Q.     With regard to the suppressor, isn't it true

21     that the agent repeatedly asked Mr. Faye to get him such

22     an item before an item was provided to him?

23        A.     I know that -- I know there were

24     conversations, but the initial conversation about the

25     suppressor occurred when Mr. Faye showed the undercover

1    employee a picture of that suppressor on a rifle.

2         Q.    And so did -- was the agent able to capture

3    a screenshot of that picture?

4         A.    Realtime, I don't think so.

5         Q.    Has it been recovered since the execution of

6    the search warrant or from his telephone?

7         A.    The picture --

8         Q.    Yes.

9         A.    -- that you're referring to?

10        Q.    Yes.

11        A.    I'm not sure, actually.

12        Q.    All right.  The FBI has his telephone;

13   correct?

14        A.    Yes.

15        Q.    And I'm sure that a search warrant will be

16   obtained or has been obtained to search that telephone?

17        A.    Yes.

18        Q.    Has it -- has the phone been searched yet?

19        A.    Yes.

20        Q.    Did they -- did the agents find a picture of

21   the suppressor that's described in the complaint?

22        A.    I don't know.

23        Q.    You would agree that there has been a

24   tremendous amount of publicity in the news media

25   concerning the things that are going on at the southern

1  border; correct?

2      A.    I've seen some news reports about it, yes.

3      Q.    And it's very controversial.  Have you seen

4  news reports about this very case, in fact?

5      A.    No, I've --

6      Q.    Okay.

7      A.    -- intentionally not observed or read those

8  articles.

9      Q.    You're aware that politicians in the

10 United States, particularly members of the Republican

11 party and in Texas, are constantly saying that we are

12 being invaded by migrants from the southern border;

13 correct?

14          MR. KURTZMAN:  Your Honor, I'm going to

15 object to relevancy here.

16          MR. BAKER:  It goes to my client's mental

17 state, Your Honor, and his risk of dangerousness.

18          THE COURT:  Overruled.  He can answer.

19 BY MR. BAKER:

20     Q.    So you're aware that politicians are saying

21 that there is an invasion of our country and that the

22 state of Texas has got to not follow the Supreme Court

23 and federal law and keep that razor wire down there.

24 That's being stated regularly on Fox News, News Max and

25 other news organizations are promoting this idea;

1    correct?

2         A.    Yes, I've seen that.

3         Q.    Do you think that people who perhaps have

4    mental health issues could be subject to becoming very

5    upset about hearing an invasion of their own country?

6              MR. KURTZMAN:  Your Honor, I'm going to

7    object.  That's beyond Mr. Potts -- or Agent Potts'

8    expertise to talk about what mental health may or may not

9    cause someone to do.

10             THE COURT:  Yeah, I think it's a little far

11   afield.

12             MR. BAKER:  Okay.

13   BY MR. BAKER:

14        Q.    Let's talk about -- so you've been

15   investigating Mr. Faye since at least March 2023?

16        A.    Correct.

17        Q.    So you're aware that he was committed to a

18   mental hospital in November?

19        A.    I've not seen any reports about that.

20        Q.    You're not aware of that?

21             THE COURT:  When was that, Mr. Baker?

22             MR. BAKER:  November.

23             THE COURT:  Of?

24             MR. BAKER:  2023.

25             THE COURT:  Okay.

BY MR. BAKER:

Q.    So you guys didn't have eyes on Mr. Faye every day, did you?

A.    No.

Q.    And, in fact, this black SUV that he thought was surveilling him that we -- that you testified about earlier back in January, the government didn't have an SUV out there watching him, did they?

A.    Not at that time, no.

Q.    So either it was somebody else or maybe Mr. Faye was delusional; would that be fair?

A.    It could have been someone else, but I can't speak to his mindset.

MR. BAKER:  May I have just a second, Your Honor.

THE COURT:  You may.

BY MR. BAKER:

Q.    Agent Potts, you're interpreting words that Mr. Faye has said based on your experience I think you said.  So, for example, earlier when you testified that they could pick some up off the ground, that that might mean there's dead bodies, something along those lines?

A.    Uh-huh (affirmative).

Q.    Okay.  So it would be fair to say that when someone speaks words, we have to try to determine what

1    they mean by then; right?

2         A.    Yeah.

3         Q.    As part of your investigation, that's what

4    you're trying to do, you're trying to see if he's using

5    coded words to suggest that they're really going to go to

6    Texas and shoot agents and immigrants at the border;

7    right?

8         A.    Right.

9         Q.    Now, wouldn't you want to know if a person

10   had mental health problems?  In other words, delusional.

11   Would that be something you'd be interested in as an

12   agent in knowing?

13        A.    I would only -- I would -- if I'm conducting

14   an investigation, I'm going to stick to the facts of what

15   an individual says and what that individual's actions

16   show.

17        Q.    Okay.

18        A.    Whether or not that individual has a -- has

19   a mental health issue, that doesn't -- people commit

20   federal crimes regardless of whether they have mental

21   health conditions -- or might commit a federal crime

22   regardless of their health status, so.

23        Q.    So you don't really want to know whether

24   they have mental health issues?

25        A.    It might be a data point, but it's not

1   something that I seek out as part of conducting an

2   investigation.

3           Q.    It might -- it might show you something

4   about a person's intent about whether they really intend

5   to carry out some type of threatening action based on

6   words that they've said; correct?

7           A.    I don't know.  I'm not -- I'm not a -- I'm

8   not a physician that can diagnose whether or not --

9           Q.    Okay.

10          A.    -- an individual would be more or less

11  likely to commit an act because of a mental health

12  status.

13          Q.    Would you be interested to know that a

14  mental health professional has diagnosed him with having

15  delusional thoughts?

16          A.    Sure.  Okay.

17          Q.    And I'm sure you'd also want to know that

18  his delusions are paranoid and persecutory in nature,

19  according to mental health professionals; correct?  You'd

20  want to know about that?

21          A.    (speaking at the same time).

22          Q.    If that's true, that's something that might

23  have some influence on what the person -- what the

24  person's words mean, right, and whether those are

25  accurate?

1      A.    Okay.  It might, yeah.

2      Q.    Okay.  In the -- in the recording that we

3 heard, the undercover agent, when he's talking to

4 Mr. Faye about the border, he's -- well, first of all,

5 what -- what tactics did they use to befriend Mr. Faye?

6 Certainly they didn't say, hey, we're from the

7 government.  They pretended to be somebody.  Who did they

8 pretend to be?

9      A.    Just a like-minded individual, you know, who

10 reached out on social media.

11      Q.    Okay.  And he met the agent on TikTok; is

12 that right?

13      A.    That was where the initial introduction

14 occurred, yes.

15      Q.    Did the agent, in order to get Mr. Faye to

16 go along with this, call him repeatedly, sometimes 20 and

17 30 times a day?

18      A.    I'm not aware of that many calls having

19 occurred.

20      Q.    Did they make suggestions to him when he

21 would say he didn't want to talk about the border, did

22 they repeatedly bring up the border to try to get him to

23 talk about it?

24      A.    I don't know if they -- if they tried to get

25 him to talk about it, but in their role as an undercover

1    employee who had -- who had befriended Mr. Faye online

2    for a specific reason, based on our investigation, it

3    would be natural for them to talk about the things that

4    Mr. Faye was interested in, including the original reason

5    for their -- for their initial contact.

6         Q.    Okay.  Did they give him gifts such as Don't

7    Tread on Me flag, a Second Amendment patch, food?

8         A.    I know that they brought him some food when

9    he was sick.  I think they -- I think they brought him

10   some soup or something like that.

11        Q.    In fact, on that day they called him before

12   they went to his house, and he told them don't come over,

13   I'm sick, but they went anyway; correct?

14        A.    I think that -- if I recall, that was part

15   of it.

16        Q.    Tannerite is -- what is Tannerite?

17        A.    I've never used it before, but it's a --

18   it's a very mild explosive that can -- farmers use it to

19   blow up stumps and things like that.

20        Q.    You can legally buy it?

21        A.    Yes.

22        Q.    And the Tannerite that was recovered during

23   the search warrant was unopened, I understand?

24        A.    That I don't know.

25        Q.    But it's a legal substance that you can buy

1  at many different stores?

2          A.    That's correct.

3          Q.    People use it for target practice, don't

4  they?

5          A.    I have heard of people shooting it before.

6          Q.    Okay.  I think you can do a quick Google

7  search and see people using it for target practice.

8          A.    Okay.

9          Q.    Now, the complaint says that Mr. Faye

10  allegedly told this undercover agent that he stationed

11  butane tanks around his property so that in the event law

12  enforcement arrived he could use the tanks as a booby

13  trap explosive device.  That's on page -- paragraph 15 of

14  the complaint.  How many butane tanks were out there?

15          A.    I don't know how many were recovered, if

16  there were --

17          Q.    All right.  Well, isn't the reality, Agent,

18  is they're not butane tanks, they're propane tanks?

19          A.    There are -- there are both.  There are two

20  kinds.  I mean, there are tanks for butane, as far as I

21  know.

22          Q.    Have you seen a photograph of the butane

23  tanks?

24          A.    No.

25          Q.    Have you seen a photograph of the propane

1  tanks?

2      A.    No.

3      Q.    Is it possible that this complaint has a

4  mistake and the butane really should be propane?

5      A.    I can't say that.  I don't know what -- how

6  that information was reported from the initial subject.

7  As far as the case, I don't know.

8      Q.    Well, how in the world, if it was a propane

9  tank, would it be used as a booby trap explosive device

10 or converted into a Claymore mine?  How would that work?

11     A.    So I'm not a -- I'm not a bomb tech.  But I

12 think there is a -- there is a misconception that you

13 can't do that.  I don't know if you can just shoot a

14 propane tank and just blow it up.  I assume -- actually,

15 I don't want to assume.  I don't know if that --

16     Q.    You don't know.

17     A.    -- if you can do that.  But I'm sure that

18 they can be (indiscernible) fashioned in a way that

19 might -- a booby trap might happen.

20     Q.    A Claymore mine is something used by the

21 military; correct?

22     A.    Yes.

23     Q.    So this undercover is claiming that Mr. Faye

24 said something about that somehow that Tannerite could be

25 converted into a Claymore mine, which discharges steel

fragments. But isn't it true that Mr. Faye had propane
tanks, the kind you get at the convenience store to hook
up to your grill that have the little dial on top?

          MR. KURTZMAN: Your Honor, I'm going to
object. It's been asked about three times. I think it's
pretty clear Agent Potts wasn't there at the search
warrant.

          THE COURT: Are you going to clear that up?
Because you got him to adopt this statement and it's in
the statement, so.

BY MR. BAKER:

     Q.    The reality is --

          THE COURT: If you want to clear it up, I'll
let you clear it. But if you're not going to clear it
up, then he's said this is his testimony, he's got an
opportunity to ask him about it.

          MR. KURTZMAN: I agree, Your Honor. I think
he's just asked him about it three times.

          THE COURT: I'll let you go a little bit
further if you need to, Mr. Baker.

          MR. BAKER: Thank you, Your Honor.

BY MR. BAKER:

     Q.    You don't know anything about these propane
tanks or butane tanks or Tannerite, other than what's in
paragraph 15 and footnotes 1 and 8 of this complaint;

1   correct?

2           A.    That's correct.  I was not there.

3           Q.    All right.  Didn't Mr. Faye tell you that

4   the only group that he wanted on his property were people

5   who wanted to shoot and hunt and fish and camp and learn

6   how to live off the land?

7           A.    He did talk about that, yeah.

8           Q.    In case there's a zombie apocalypse or

9   something.  You-all talked about that?

10          A.    Zombies did not come up, but...

11          Q.    Okay.  What did you talk about along those

12  lines?

13          A.    Just that he had -- he had met up with

14  people in the past in order to talk about

15  survival-related skills.

16          Q.    And that's not illegal, is it?

17          A.    No.

18          Q.    Have you ever heard the song "Country Boy

19  Can Survive" by Hank Jr.?

20          A.    Yes.

21          Q.    Pretty much expresses those same sentiments,

22  doesn't it?

23          A.    Sure.

24          Q.    Did the agent record the meeting where the

25  hundred dollars -- where the suppressor was supposedly

1    sold to him for a hundred dollars?

2         A.    I don't know.

3         Q.    Okay.  Did the agent tell you that Mr. Faye

4    didn't ask for money and the agent said, oh, I'd feel bad

5    if you don't take this money?

6         A.    No, it was not --

7         Q.    That wasn't really a sale, he was just going

8    to give it to him.

9         A.    It was not relayed to me that that's how

10   that occurred.

11        Q.    Okay.

12        A.    That's what Mr. Faye told me during the

13   interview.

14        Q.    Okay.  So when was this interview you had

15   with Mr. Faye?

16        A.    Post arrest.  At the -- on February 5 after

17   he was arrested.

18        Q.    And you've written a report about that?

19        A.    Yes, I co-authored a report.

20        Q.    Who else wrote it with you?

21        A.    Another special agent.

22        Q.    Okay.  He was present during the statement?

23        A.    Yes, he was.

24        Q.    Okay.  During that -- during his interview,

25   he repeatedly told you, did he not, that he didn't have

1  any plans to go shoot anybody at the border and wouldn't

2  do that?

3          A.    He did.

4          Q.    Okay.  Do you believe him?

5          A.    Based on the investigation that we

6  conducted, no.

7          Q.    Okay.  Has Mr. Faye ever hurt anyone, to

8  your knowledge?

9          A.    I didn't hear you.

10         Q.    Has Mr. Faye ever hurt anyone to your

11  knowledge?

12         A.    Hurt anyone?

13         Q.    Hurt anyone.

14         A.    Not to my knowledge.

15         Q.    Has he ever been arrested?

16         A.    I think I remember there being an arrest

17  for -- might have been a traffic -- traffic-related

18  thing, DUI.  I'm not exactly sure, but I -- it was a

19  while ago, I believe.

20         Q.    You would agree with me that he has no

21  significant criminal record whatsoever?

22         A.    Right.  Yeah.

23         Q.    In the last two, three, four years has he

24  been to Texas?

25         A.    Not that I know of.

1      Q.    Are you aware of him going to any of these

2   other states to try to, quote, recruit people?

3      A.    No.

4      Q.    Are you aware of Mr. Faye ever shooting at

5   anyone?

6      A.    I'm not aware of that happening.

7            MR. BAKER:  Your Honor, just a moment,

8   please.

9   BY MR. BAKER:

10      Q.    Were the butane and/or propane tanks

11   recovered from the property?  Were they seized?

12      A.    The FBI did not seize any tanks.

13            MR. BAKER:  Okay.  That's all, Your Honor.

14            THE COURT:  Redirect, Mr. Kurtzman.

15                  **REDIRECT EXAMINATION**

16   BY MR. KURTZMAN:

17      Q.    Agent Potts, in the investigation into

18   Mr. Perry and Odell, was an undercover employee of the

19   FBI used in that investigation as well?

20      A.    Yes.

21      Q.    Okay.  Was that the same undercover employee

22   that was used in the investigation of Mr. Faye?

23      A.    Yes, it was.

24      Q.    And so that individual introduced himself to

25   Mr. Perry and Odell in the same sort of form or function

1    that he did with Mr. Perry and Odell?

2         A.    That's correct.

3         Q.    And I know you weren't out at the search

4    warrant.  Do you know whether or not a Second American

5    Militia patch was recovered during the execution of the

6    search warrant.  If you don't know, that's fine.

7         A.    Yeah, I can't recall if there was or not.

8              MR. KURTZMAN:  No further questions,

9    Your Honor.

10             THE COURT:  I wanted to ask a couple of

11   questions.  Your testimony, you talked about this

12   Mr. Gibson and Mr. Gibson was trying to organize people

13   to go to the border.  When was that occurring?

14             THE WITNESS:  So, Your Honor, that was

15   occurring within -- in the January -- December, January

16   timeframe from what I can recall.

17             THE COURT:  2023-2024?

18             THE WITNESS:  Yes, sir.

19             THE COURT:  You said, I think, that

20   Mr. Gibson did, in fact, go to the border in January of

21   2024?

22             THE WITNESS:  Yes.

23             THE COURT:  Was he arrested?

24             THE WITNESS:  He was not.

25             THE COURT:  Has he been charged with

1 anything related to that?

2         THE WITNESS: No. There was another

3 individual from a different state that was -- that came

4 down at the same time. He was arrested for having -- for

5 illegally possessing a firearm while he was there, but

6 Mr. Gibson has not been charged.

7         THE COURT: Was there law enforcement

8 encounter with Mr. Gibson at that time?

9         THE WITNESS: Yes, I believe that DPS,

10 Department of Public Safety for State of Texas had an

11 interaction with him and it wasn't -- wasn't -- not that

12 I'm aware of, it wasn't at our request. But they

13 typically do, from what I understand, have interactions

14 with anyone who does come down to the border.

15         THE COURT: Okay. All right. And you said

16 that after this communication between Mr. Faye and the

17 confidential agent that -- January 23 that you decided to

18 make an arrest at that time based on the rhetoric that

19 Mr. Faye was using at the time. Tell me what was

20 different and how it was different at that time compared

21 to the, you know, nine months or so that you'd already

22 had Mr. Faye as a target.

23         THE WITNESS: So he was -- so we noticed

24 just as in the -- as in the call that we heard, you know,

25 just him, you know -- there's a couple things. A, being

1  potentially -- getting -- you know, seeing the federal --

2  the SUV out front, him threatening through those --

3  through that commentary about saying that he was, you

4  know, going to take out agents if they ever came for him,

5  that he was ready.

6         His -- the fact that he had his -- he was

7  waiting for his truck to be done and completed, the work

8  on it being completed.  He kept saying that once that

9  truck was done that he was going to now be ready to go

10 down to the border.  You know, those two things, I think,

11 is what -- like, what led us as the FBI to say, okay, if

12 the truck is about to be done -- we were aware that the

13 truck was in the shop and was aware that it was going to

14 be done within -- potentially, you know, a few days or to

15 a week.

16        So we decided after knowing that he was

17 going to have that court date, that that would probably

18 be a good safe opportunity to make the arrest based on

19 the -- on the firearms charge.

20        THE COURT:  In terms of his discussion about

21 what I'll call the underlying issue, the concerns about

22 the border, that wasn't different.  It was this belief

23 that somebody was watching him and more immediate plans

24 to take action, is that what I'm hearing you say?

25        THE WITNESS:  Yes.

1              THE COURT:  Okay.  And you mentioned that he
2    was arrested at the Davidson County courthouse.  What
3    was -- what was he there for?  What were the proceedings
4    that he was in court for?
5              THE WITNESS:  So the accident where his
6    truck had to go into the shop --
7              THE COURT:  Uh-huh (affirmative).
8              THE WITNESS:  -- he was there related to --
9    to serve as a witness for the State, for their case on
10   the driver of the vehicle that hit him.
11             THE COURT:  I see, okay.  And when this
12   search warrant was executed at Mr. Faye's residence,
13   there's been a little bit of discussion about the
14   execution of that warrant.  I understand you weren't
15   there; right?
16             THE WITNESS:  That's correct.
17             THE COURT:  Okay.  And in response to
18   Mr. Kurtzman's questions, you indicated there was some --
19   some weapons discovered; correct?
20             THE WITNESS:  Yes.
21             THE COURT:  Firearms?
22             THE WITNESS:  Yes.
23             THE COURT:  Other types of weapons?
24             THE WITNESS:  There were firearms, two -- I
25   think there were two scopes, and there was also another

1  suppressor -- they were all located within a cabinet of

2  sorts.

3              THE COURT:  Okay.  I assume that the other

4  suppressor was illegal for him to possess as well or have

5  you made a determination about that suppressor?

6              THE WITNESS:  I think -- if I remember

7  correctly, a determination was made by an on-site member

8  who had the ability from the ATF to make those decisions.

9  And I think that it was, but I can't recall.

10              THE COURT:  You think it was illegal or was

11  legal?

12              THE WITNESS:  It was illegal.

13              THE COURT:  Illegal.

14              THE WITNESS:  But I can't -- I have not seen

15  a report.  It hasn't been --

16              THE COURT:  Okay.

17              THE WITNESS:  -- done yet.

18              THE COURT:  And -- but that's not the

19  suppressor he's charged with; right?

20              THE WITNESS:  No.

21              THE COURT:  And you don't know -- is there

22  anything about the suppressor that you charged him with

23  that you can connect to the photograph that was allegedly

24  displayed?

25              THE WITNESS:  So the -- just -- I guess

1   through talking with the undercover who observed the

2   photograph, it was my -- my impression that it was the

3   same one.

4             THE COURT:  Does that undercover agent have

5   any sort of specialized firearms training or something

6   else that would allow him to be able to match the

7   photograph that he saw with the suppressor that he was

8   later given or later purchased?

9             THE WITNESS:  I don't know what level of

10  training -- I mean, if I tried to look at a picture of it

11  and then comparing to the one he was actually given.

12            THE COURT:  Okay.  But you don't know

13  anything -- I think you said to Mr. Baker's question, you

14  don't know anything about that original photograph he

15  allegedly saw.  You don't know if it exists any more or

16  something?

17            THE WITNESS:  It could.  I just haven't seen

18  it.

19            THE COURT:  I understand.

20            THE WITNESS:  Just -- yeah.

21            THE COURT:  Okay.  Apart from that other

22  silencer, were there any other weapons that were

23  discovered that would be illegal for Mr. Faye to possess?

24            THE WITNESS:  Yes, I believe there was also

25  a sawed-off shotgun that, based on its length, also would

1  have needed to be registered with the transaction record.

2          THE COURT:  Okay.  Was there anybody else

3  that lived at that residence?

4          THE WITNESS:  Where -- not -- well, it was a

5  large property with multiple structures, the way I

6  understand it, and that there were other individuals who

7  were living on the property.  But as far as in the --

8  inside the trailer where he was -- where Mr. Faye was

9  residing at the time, I don't think that there was

10  anybody else living in there.

11          THE COURT:  Did he make any statements in

12  the interview that you conducted with regard to the

13  sawed-off shotgun or the other silencer?

14          THE WITNESS:  No, because I didn't know that

15  that -- that those existed at the time because there were

16  two things, the arrest and the search, were happening

17  concurrently.

18          THE COURT:  Okay.  Was ammunition

19  discovered?

20          THE WITNESS:  Yes.

21          THE COURT:  How -- you know, ballpark, any

22  idea about how much ammunition we're talking about?

23          THE WITNESS:  I'm not sure.

24          THE COURT:  Okay.  And what about tactical

25  gear?

1          THE WITNESS:  I believe there were some --
2     there were some tactical gear found in the room where the
3     firearms were.
4          THE COURT:  Vests or something like that
5     or --
6          THE WITNESS:  (indiscernible).
7          THE COURT:  I'm sorry?
8          THE WITNESS:  Yes, the tactical vest, the
9     way I understand.
10          THE COURT:  Okay.  And what about -- what
11    about any sort of plans or maps or anything like that,
12    any of that sort of information discovered?
13          THE WITNESS:  Not upon -- not as far as I
14    know inside his residence.  I don't think so.
15          THE COURT:  Okay.  And Mr. Baker asked you
16    some about the Tannerite and the propane or butane tanks,
17    whatever that was.  But more importantly, was there
18    anything that was discovered that you would characterize
19    as a booby trap?
20          THE WITNESS:  No.
21          THE COURT:  Okay.  And I think -- I think
22    that was all I wanted to ask about.
23          Mr. Kurtzman, did you want to follow up on
24    any of my questions?
25          MR. KURTZMAN:  No, Your Honor.

1            THE COURT:  All right, very good.

2            Mr. Baker, anything you want to follow up on

3    related to my questions?

4            MR. BAKER:  Just a couple, Your Honor.

5            THE COURT:  Okay.  Just briefly, please.

6            MR. BAKER:  Yes, Your Honor.

7                    **RECROSS-EXAMINATION**

8    BY MR. BAKER:

9        Q.    Just want to make clear.  The other firearms

10   and ammunition that were found at the search warrant,

11   he's not a prohibited person under federal law in any

12   way; correct?

13       A.    Not as far as I know, no.

14       Q.    And other than the suppressor and a possible

15   sawed-off shotgun, there were no other illegal items that

16   he had; correct?

17       A.    Right.

18       Q.    I'm looking at a receipt of property from

19   the search warrant.  I don't see anything about a vest.

20   Is it possible there were no vests found?

21       A.    Yeah, I -- I wasn't there, so I'm not sure

22   what...

23            MR. BAKER:  That's all, Your Honor.

24            THE COURT:  All right.  Mr. Kurtzman?

25            MR. KURTZMAN:  I'm good, Your Honor.  I just

1    have a couple things to proffer on.

2              THE COURT:  That's fine.  I just wanted to

3    make sure you didn't want to follow up.  Thank you,

4    Agent Potts, appreciate your testimony.  You can step

5    down now.

6                    *****WITNESS EXCUSED*****

7              MR. KURTZMAN:  Your Honor, I'm just

8    proffering that the vests weren't seized from the scene,

9    but pictures were taken of them.  Would note under

10   federal law because -- and this is a little argument, but

11   a search of the NFRTR was run.  And so any suppressor, if

12   it was in Mr. Faye's possession, would be illegal,

13   doesn't matter if it had a tax stamp or not.

14             THE COURT:  He didn't have an FFL, I assume.

15             MR. KURTZMAN:  No, Your Honor.

16             Also proffer into the record that a Second

17   American Militia patch was recovered during execution of

18   the search warrant, and the picture described by the

19   undercover of the gun cabinet with the suppressor

20   attached to a rifle was obtained through the returns of a

21   search warrant to one of Mr. Faye's social media

22   accounts.

23             THE COURT:  Do you know any more about where

24   the patch was discovered?

25             MR. KURTZMAN:  It was in his -- the area

1   that he controlled at the property.

2                   THE COURT:  I understand, but, like, had he

3   affixed it to some, you know, shirt or was it in the

4   drawer or, you know --

5                   MR. KURTZMAN:  It was on the tactical vest,

6   Your Honor.

7                   THE COURT:  Okay.

8                   MR. KURTZMAN:  And then, Your Honor, just --

9   it's in the record, so I didn't ask Agent Potts

10  specifically about it, but there's another recorded phone

11  call in Exhibit 2, which I actually think would like --

12  it is -- Exhibit 2 is unredacted, and so I'd like that

13  placed under seal, if possible, Your Honor.

14                  THE COURT:  You want the whole exhibit under

15  seal or just redact that version?

16                  MR. KURTZMAN:  We'll do the whole exhibit

17  under seal, Your Honor, rather than go through and redact

18  everything.

19                  THE COURT:  Mr. Baker, do you have any

20  objection to that?

21                  MR. BAKER:  No objection.

22                  THE COURT:  All right.  I'll file it under

23  seal, then.  Make sure you make a note of it.

24                  MR. KURTZMAN:  Your Honor, just so you're

25  aware, there's a conversation that extends from

    1    pages 19 -- excuse me.  It was page 12.  19 was the

    2    conversation we listened to.  But page 12 through 14

    3    where Mr. Faye discusses with the undercover their need

    4    to investigate things in the state of Tennessee where he

    5    believes they're bringing migrants to here; i.e., so

    6    rather than travel they could take care of the things

    7    here.  And he references his belief that some of these

    8    facilities processing migrants may be located in

    9    Knoxville or Memphis.  Just don't want to surprise you

   10    when I'm making my argument.

   11                THE COURT:  All right.  Thank you.

   12                All right.  Mr. Baker, do you have any proof

   13    you want to put on?

   14                MR. BAKER:  Your Honor, I have three

   15    witnesses that I intend to call.

   16                THE COURT:  All right.

   17                MR. BAKER:  I don't think they'll be very

   18    long witnesses, Your Honor, but they're witnesses from

   19    the family about detention.

   20                THE COURT:  All right.

   21                MR. BAKER:  Your Honor, first I'd call

   22    Ms. Tiffany Luebke.

   23                THE COURT:  All right, ma'am.  If you'd step

   24    up and be sworn.

   25

1                    **TIFFANY LUEBKE**

2   called as a witness, after having been first duly sworn,

3   testified as follows:

4            COURTROOM DEPUTY:  Could you please state

5   your name for the record.

6            THE WITNESS:  Tiffany Luebke.

7            COURTROOM DEPUTY:  And could you please

8   spell your first and last name.

9            THE WITNESS:  T-i-f-f-a-n-y, L-u-e-b-k-e.

10           COURTROOM DEPUTY:  Please have a seat.

11                 **DIRECT EXAMINATION**

12  BY MR. BAKER:

13       Q.   Hello, Ms. Luebke.  What is your

14  relationship to Paul Faye?

15       A.   He's my father.

16       Q.   All right.  And you might want to speak up

17  just a little bit.

18       A.   Can you hear me?

19       Q.   I'm kind of hard of hearing, so if you'd

20  just speak nice and loud for us.  So you've known your

21  father all your life?

22       A.   Correct.

23       Q.   And what do you do for a living, Ms. Luebke?

24       A.   I'm an officer manager for a real estate

25  agent.

1    Q.   And where is your office?

2    A.   In Clarksville.

3    Q.   How long have you been in that position?

4    A.   March 1 will be three years.

5    Q.   Okay.  Do you live in the Clarksville area?

6    A.   I do.

7    Q.   And your father, Paul Faye, where does he

8  live?

9    A.   In Cunningham, Tennessee.

10    Q.   How close is that to Clarksville?

11    A.   It's about 45 minutes, 35 to 40.

12    Q.   Is it south of Clarksville in Montgomery

13  County?

14    A.   (indiscernible).

15    Q.   Is it in Montgomery County?

16    A.   Yes (indiscernible).

17    Q.   Okay.  And are you close with your father?

18    A.   I am.

19    Q.   How often do you see him?

20    A.   Quite often.

21    Q.   What would that mean?

22    A.   I handle all of his medical.

23    Q.   I'm sorry?

24    A.   I handle all of his medical.

25    Q.   But, I mean, how often would you say you see

1   him in a given month or talk to him?

2         A.    Almost every other day he calls me, talks to

3   me.

4         Q.    Okay.  Now, have you ever known your father

5   to be violent?

6         A.    No.

7         Q.    And does he have any criminal record that

8   you're aware of?

9         A.    Not that I'm aware of.

10        Q.    Did you grow up with him in your household?

11        A.    I did.

12        Q.    Was he violent when you were a child?

13        A.    No.

14        Q.    What kind of father is he to you?

15        A.    Amazing.  Anything I needed, he's always

16  been my handyman.

17        Q.    Okay.  You're married?

18        A.    I am.

19        Q.    Who are you married to?

20        A.    Jesse Luebke.

21        Q.    Is he here in the courtroom today?

22        A.    He is.

23        Q.    What does he do for a living?

24        A.    He is an active-duty soldier.

25        Q.    What's his rank?

1        A.    He's an E6.

2        Q.    Does that mean sergeant?

3        A.    Yes.

4        Q.    Okay.  Has he recently returned from

5 deployment overseas?

6        A.    Yes.

7        Q.    What country was he in?

8        A.    In Poland.

9        Q.    And how long has he been back?

10       A.    Well, he's been back since January 31.

11       Q.    Did something happen to your father some

12 years ago that caused him some trauma?

13       A.    He's done several things.

14       Q.    Tell us about that.

15       A.    He used to do bull riding before I was born,

16 I know that (indiscernible) he's done a lot.

17       Q.    Well, was there some type of situation that

18 involved him welding and some noxious fumes?

19       A.    Yes.

20       Q.    Tell us about that situation.

21       A.    Yes, he was working around a lot of fumes

22 and stuff, and at home -- he come home one day and he

23 had -- he just like shriveled up, he couldn't breathe

24 good and we had to call an ambulance.  I was a child

25 then.

1      Q.    Was he taken to the hospital?

2      A.    Yes.

3      Q.    About how long ago was that?

4      A.    I was about 14, 15 years old.

5      Q.    All right.  So how long ago was that?

6      A.    Goodness.  I'm 35 now, so.

7      Q.    About 20 years ago?

8      A.    Yeah.

9      Q.    Okay.  Did -- more recently, say within the

10 last ten years, have you noticed or has the family

11 noticed changes in his behavior and in his thinking?

12     A.    Yes.

13     Q.    Tell us about that, please.

14     A.    I have noticed he would talk to himself.  I

15 would notice he would even salute the woods and stuff

16 when I'm talking to him.  I'd be, like, who are you

17 talking to, Dad?  Oh, you know, that guy out there.

18 There was nobody there.

19     Q.    So he's talking to somebody that's not

20 there?

21     A.    Uh-huh (affirmative).

22     Q.    You said he was saluting trees?

23     A.    Yes.

24     Q.    Has your father ever been in the military?

25     A.    No.

1      Q.    Has he ever expressed any delusions to you

2 about the military?

3      A.    Not -- he has a mindset, I don't know how to

4 explain it, sorry.  More of a -- I can't even put it into

5 words.  He has -- he really has.  It's just that he

6 expresses more to, like, politics and (indiscernible)

7 stuff like that.

8      Q.    Does he talk about politics a lot?

9      A.    Yeah.

10     Q.    Does he watch the news a lot?

11     A.    He does.

12     Q.    Have you had conversations with him about

13 the border?

14     A.    I haven't, no.

15     Q.    Has he ever told you that he wanted to go to

16 the border and shoot anybody?

17     A.    Absolutely not.

18     Q.    Have you ever heard your father say he

19 wanted to shoot anyone?

20     A.    No, he wouldn't hurt a fly.

21     Q.    Do you believe that your father would have

22 followed through and gone to the border and shot anyone?

23     A.    Absolutely not.

24     Q.    How does your father feel about law

25 enforcement?

1      A.   He's always been great for them.  Like, I've

2  never heard him talk negative.  He's always wanted to

3  help.  Even when -- during the Clarksville storm, he was

4  out trying to help the -- help them pull out people just

5  to help.

6      Q.   What did he do during the storm -- are you

7  talking about the storm we had back in January?

8      A.   Yeah.

9      Q.   What did he do?

10     A.   He went out and helped the police department

11 pull out people left and right.

12     Q.   Does your father generally express support

13 of law enforcement?

14     A.   I'm sorry, what was that?

15     Q.   Does he generally express support --

16     A.   Yes.

17     Q.   -- for law enforcement?

18     A.   Yeah, he's always been grateful for them.

19     Q.   Okay.  Did something happen in November of

20 this year that caused you to seek attention for your

21 father?

22     A.   He actually called me for help.  He said he

23 was going crazy.  He said he didn't feel right and he

24 needed help.  And that's what he -- I came to his help

25 and I took him to the hospital.

1         Q.     What hospital did you take him to?

2         A.     I took him to NorthCrest.

3         Q.     Where is that?

4         A.     Exit 24.

5         Q.     In the Clarksville area?

6         A.     Springfield.

7         Q.     Okay.  What happened from there?

8         A.     They had admitted him to Pine Springs.

9         Q.     Okay.

10        A.     It's a psychiatric hospital.

11        Q.     Where is Pine Springs Psychiatric Hospital

12 located?

13        A.     It is on the other side of Nashville.  I

14 don't know the exact address.  But it's in Nashville.

15        Q.     And how long was he committed to this

16 psychiatrist hospital?

17        A.     He was there for a week.

18        Q.     Did you find out what his diagnosis was?

19        A.     They did tell me it was bipolar disorder.

20        Q.     Was he prescribed medication?

21        A.     He was.

22        Q.     What kind of medication is he prescribed?

23        A.     Risperdal and he had (indiscernible) for

24 anxiety.

25        Q.     Okay.  Risperdone (sic), that's a drug for

1    mental health issues?

2        A.    Yes.

3        Q.    How does your father do when he's taking his

4    Risperdone?

5        A.    He's good when he's on it.  He's like a

6    normal human.

7        Q.    Okay.  Let's step back.  So he went to Pine

8    Wood; he was there about a week and then they discharged

9    him?

10       A.    Yes.

11       Q.    Did you see his father after he was

12    discharged?

13       A.    Yes.

14       Q.    After he was discharged, was he taking his

15    medication?

16       A.    He was taking his medication, yes, to my

17    knowledge.

18       Q.    All right.  How does he do when he doesn't

19    get his medication as needed?

20       A.    He starts talking to himself again, seeing

21    things.  Just not himself.  He'll literally just have a

22    whole conversation with himself.

23       Q.    After he was arrested Monday, did you get

24    very concerned about his medication?

25       A.    I did.

```
 1          Q.     In fact, so concerned that you contacted me?
 2          A.     I've contacted you several times.
 3          Q.     Did you contact me many, many times --
 4          A.     I did.
 5          Q.     -- worried about your father's medication?
 6          A.     I did.
 7          Q.     So he -- he was arrested Monday and he went
 8   to the Warren County jail in Bowling Green, Kentucky.
 9   You're aware of that?
10          A.     Uh-huh (affirmative).
11          Q.     And, in fact, you were in contact with him
12   while he was in jail?
13          A.     I did.
14          Q.     I think you had a video with him maybe on
15   Wednesday?
16          A.     Yes.
17          Q.     And what was his mental condition like on
18   that video?
19          A.     He was not doing good.  He was starting to
20   slur.  You can tell he was really anxious, and just kind
21   of pacing and repeating himself.
22          Q.     Did he tell you whether he had been given
23   his medication?
24          A.     He did say that they have not given him his
25   medication yet and he felt really, really bad and just
```

1  wasn't himself.

2       Q.    Did you contact me again on Friday morning

3  of last week?

4       A.    I did.

5       Q.    Had you had a conversation with your father

6  on Friday morning?

7       A.    Yes.

8       Q.    What did he tell you?

9       A.    He said he still hadn't had his medication

10 yet.  They told him it was on order, but he hadn't

11 received it yet.

12      Q.    Okay.  Did he finally get some medication on

13 Friday?

14      A.    Yes, by the end of the evening.

15      Q.    Okay.  Have they given him his medication

16 properly since Friday?

17      A.    No.

18      Q.    What is --

19      A.    He usually takes his medication around

20 7:00 a.m.  I have an alarm set on my phone.  I always

21 text him or call him and tell him, hey, you need to take

22 your medications and he takes them right then and there.

23 But he is not receiving them that way in the jail.  He's

24 either receiving them too close together or not -- not at

25 all.

1      Q.    Okay.  And since Friday has there been one

2  day where he didn't get any medication and another day

3  where he only got it once?

4      A.    Yes, actually that was yesterday.  They

5  didn't give him his morning medications and then later on

6  that night he finally received them.

7      Q.    If your father were to be released, will you

8  stay in contact with him?

9      A.    Yes.

10      Q.    Will you contact him every day?

11      A.    Yes.  I talk to him every day on the phone.

12      Q.    Okay.  Can he go back and live on the

13  property where he's been living?

14      A.    Yes.

15      Q.    Now, since the search warrant's been

16  executed, all the firearms have been taken off of that

17  property; correct?

18      A.    Yes.  We even removed the two that they

19  left.  They're no longer on the property either.

20      Q.    They left two guns that belonged to Rita --

21      A.    Yes.

22      Q.    -- Pepper who's here in the courtroom?

23      A.    I don't know exactly who they belong to.

24  They're either my brother's, Joseph Faye, or my mother,

25  Rita Faye.  There was two that they left in her care, her

1  property.  And then there was two that was left in
2  (indiscernible) in his trailer.  But they have all been
3  removed.
4        Q.    And where have they been taken?
5        A.    They have been put in a safe on Joseph
6  Faye's property.
7        Q.    Okay.
8        A.    To my knowledge.
9        Q.    All right.  So, to your knowledge, there's
10 no firearms at the residence in Cunningham, if he were
11 allowed to return there?
12       A.    Correct.
13       Q.    So how big is the property out there in
14 Cunningham?
15       A.    Ten acres, to my (indiscernible).
16       Q.    And who does -- your father, Paul Faye,
17 lives there in a trailer?
18       A.    Uh-huh (affirmative).  At the top of the
19 hill.
20       Q.    And there's a house on the property?
21       A.    Yes.
22       Q.    And Ms. Rita Pepper lives in that house?
23       A.    Yes.
24       Q.    Ms. Pepper, would you raise your hand.
25 Okay.

1          That's your mother?

2     A.    That's my mother.

3     Q.    Okay.  What kind of person is your mother?

4     A.    She's the sweetest person ever.  She is

5  willing to help with whatever you need and everyone.

6     Q.    Does she have any criminal record?

7     A.    No.

8     Q.    And she's told you that all firearms have

9  been removed from the property?

10    A.    Yes.

11    Q.    Okay.  Were there any butane tanks on that

12 property?

13    A.    To my knowledge, no.

14    Q.    Were there propane tanks that are used for

15 heating?

16    A.    Yes.  I know that they had some because I

17 asked my father for one not too long ago to put on my

18 back porch for my heating unit.  But he said it was

19 empty, so he was going to get it filled up for me.

20    Q.    If your father gets released, do you have

21 any fear whatsoever that he'll try to get up with some of

22 these people that we've heard described and go down to

23 the Texas border?

24    A.    Absolutely not.

25    Q.    Okay.  Is your father -- let's talk -- what

1    do you know about your father's work history?

2         A.    He is a maintenance guy.  I mean, he's

3    helped any and everybody, any repairs.  He put himself

4    out there -- I actually added him to the neighborhood

5    page to do fence repairs and stuff like that, along with

6    he also has a -- we helped him get a lawn care business

7    called (indiscernible) Lawn Care.

8         Q.    Okay.  So he does lawn care in the

9    summertime?

10        A.    Uh-huh (affirmative).

11        Q.    Does he work for someone in the wintertime?

12        A.    I know he had a -- I don't know his name.

13   He was working for a repair company.  He actually helped

14   build the middle school (indiscernible) in Clarksville.

15        Q.    Your brothers are here in court today?

16        A.    Yes.

17        Q.    What kind of work do they do?

18        A.    Joseph -- well, they both work for a

19   concrete (indiscernible).  Two different companies, but

20   they both pour concrete.

21        Q.    Have they done work here in downtown

22   Nashville?

23        A.    Yes, they actually helped build this

24   building.

25        Q.    Did your brothers work on this very building

1  pouring the concrete?

2          A.    Yes, they did.

3          Q.    And that's Joseph and Paul, Jr., those are

4  your brothers?

5          A.    Yes.

6          Q.    Do they have a criminal record?

7          A.    No, absolutely not.

8          Q.    Okay.  If your brother -- if your father

9  gets released, the Judge is likely to put some very

10 strict rules on his conduct.

11         A.    Uh-huh (affirmative).

12         Q.    We talked about some of those.  Will your

13 father follow those rules if he gets released?

14         A.    Yes.

15         Q.    Do you have any doubt about that?

16         A.    No.

17         Q.    Will he appear in court as he's required to

18 do?

19         A.    He will.

20         Q.    Do you have any doubt about that?

21         A.    I don't.

22         Q.    Do you think he'll try to run away from

23 these charges?

24         A.    Absolutely not.

25         Q.    Is your father a loyal American?

1          A.     He is.

2          Q.     Does he love the United States?

3          A.     He does.  He even put up my own flag out at

4     my house not too long ago, he made sure to come and put

5     it up.

6          Q.     Okay.  If the Judge orders him to stay in

7     Tennessee and get mental health treatment, will he follow

8     the Judge's instructions?

9          A.     He will.  He actually had an appointment

10    today.

11         Q.     I want to talk to you about that.

12         A.     Okay.

13         Q.     After he got released from Pine Wood

14    Psychiatric, was he given an after-care plan?

15         A.     He was.  He followed up with his primary

16    care (indiscernible).

17         Q.     Okay.

18         A.     And then from there, they were giving him a

19    referral.

20         Q.     Okay.

21         A.     He was supposed to go to Athena Healthcare

22    starting on -- today was his initial appointment.

23         Q.     Okay.  So he had an appointment with Athena

24    Healthcare for today for an assessment?

25         A.     Yes.

1      Q.    And is the idea they would give him

2 outpatient therapy?

3      A.    Yes, they were going to do outpatient

4 therapy and control his medication.

5      Q.    If he -- if he were to get released, will

6 you help your father comply with that outpatient care?

7      A.    I'll make sure my mother makes sure that he

8 gets there, yes.

9      Q.    Okay.  Do you want your father to be

10 released?

11      A.    I do.

12      Q.    Okay.

13           MR. BAKER:  I think that's all my questions,

14 Your Honor.

15           THE COURT:  Mr. Kurtzman.

16                   **CROSS-EXAMINATION**

17 BY MR. KURTZMAN:

18      Q.    Hi, ma'am.

19      A.    Hi.

20      Q.    You heard the recording earlier; right?

21      A.    I did.

22      Q.    And you agree that that was your father that

23 was captured on it?

24      A.    I do.

25      Q.    Okay.  And that he expresses his desire to,

1   I think, put down as many federal agents as he could if
2   they ever came for him?
3           A.    I did hear that, yes.
4           Q.    Okay.  It's not very pro-law enforcement;
5   would you agree?
6           A.    No, I agree, it's not.
7           Q.    So you said he got taken in -- or went in
8   for mental health treatment in November and then came
9   back out.  Was there any thought about maybe taking his
10  weapons away from him after his mental health diagnosis?
11          A.    We did actually take his weapons away for a
12  while, we did.  But he started going back hunting and
13  getting back to his mental health.  We evaluated him, we
14  made sure that we thought he could control himself with
15  those guns, yes.
16          Q.    Okay.  But weren't the guns actually taken
17  away at one point because he was using methamphetamine?
18          A.    To my knowledge, I don't know what he was
19  using.
20          Q.    Okay.  But he was using drugs?
21          A.    Not to my knowledge.
22          Q.    Well, why did the family take away the gun
23  then?
24          A.    We took it away for his psych, his mental
25  state.

1      Q.    Does your father have any nicknames?

2      A.    Not to my knowledge.

3      Q.    So you've never heard anybody call him

4  Gunny?

5      A.    So I had his phone while he was gone, and I

6  even spoke to everybody and I told them that his mental

7  state was weird and that's why we got him the help that

8  he needed, because I said that it was like he was having

9  a war in his head.

10     Q.    And so if I told you that your dad

11 represented himself to the people that we were talking

12 about today, Perry and Odell and Gibson, that he

13 represented to them that he had military service in his

14 background and they could call him Gunny, like short for

15 a gunnery sergeant, you've never heard that?

16     A.    Huh-uh (negative).

17     Q.    Okay.  So you talk to your dad every day.

18 Perry and Odell were arrested back in October of 2022.

19 And you heard the testimony about your dad having further

20 contact with them.  Did he ever tell you about his

21 friends who were arrested in Missouri?

22     A.    No, I don't know any of that side of him.

23 I've never heard of that.

24           MR. KURTZMAN:  No further questions.

25 Thanks.

1            THE COURT:  So you heard the calls, the

2 recordings.  Was the kind of things he was talking about

3 with regard to the border and things going on and

4 migrants, stuff like that, was that something that he

5 talked about regularly?

6            THE WITNESS:  No, Your Honor.  I never heard

7 him talk anything like that before.

8            THE COURT:  Okay.  And you understand that

9 in light of those discussions and conversations and

10 statements that he made that it's -- you understand why

11 somebody would have a concern about him doing something;

12 right?

13            THE WITNESS:  Absolutely.

14            THE COURT:  So tell me why you don't think I

15 should be concerned about that, that you just don't think

16 that's an issue that he might act on any of that stuff.

17            THE WITNESS:  Well, I think that with him

18 getting the medical help that he needs, and that's the

19 plan is to continue -- I had him scheduled for today --

20 was to get him the mental health that he needed.  And

21 this just further proves that he needs that mental

22 health.

23            THE COURT:  He went to the inpatient

24 treatment in November; right?

25            THE WITNESS:  Yes.

```
 1          THE COURT:  And these conversations happened
 2   in January.  And so what -- how do you -- do you
 3   attribute the things he was saying to mental health
 4   issues?  What about the fact that he'd gotten treatment
 5   so far and still was having those kind of statements?
 6          THE WITNESS:  I don't think he was getting
 7   the actual full medications that he needed.  I felt like
 8   he needed more.  That's why we furthered on with the
 9   getting -- because, I mean, he was still talking to
10   himself here and there.  We noticed it, and so we thought
11   that he does need that, he needed further evaluation.
12   And I even reached out to them to get that.
13          THE COURT:  You described it in your
14   testimony as I think you said a war in his head?
15          THE WITNESS:  Yeah.
16          THE COURT:  Tell me what you mean.  Can you
17   explain that a little bit more?
18          THE WITNESS:  So I read one of the
19   conversations when -- I had his phone while he was
20   admitted, and I read one of them and I just -- it wasn't
21   something -- it was like he was in the old days of
22   something he would read out of a history book or -- like,
23   I've heard those names that he was talking about a while
24   ago, like he said, just of a -- it was we're going to the
25   bunkers or something like that.  I'm pretty sure that's
```

1    exactly what I read.  So it was just a weird -- not an

2    everyday conversation.

3              THE COURT:  Did you ask him about those

4    things?

5              THE WITNESS:  I did not.  I just -- he was

6    getting the psychiatric help, so I feel like that's their

7    expertise and not mine, so I just felt like I would

8    continue that.

9              THE COURT:  Did you -- did you talk to your

10   other family members about those things?

11             THE WITNESS:  I did.

12             THE COURT:  And what was their response or

13   reaction to it?

14             THE WITNESS:  The exact same way I felt,

15   that we needed to continue to get him the mental health

16   that he needed.

17             THE COURT:  Okay.  Any redirect, Mr. Baker?

18             MR. BAKER:  No, Your Honor.

19             THE COURT:  Thank you, ma'am.  I appreciate

20   you being here.  Thank you for your testimony.

21             Watch your step when you go down there.

22             *****WITNESS EXCUSED*****

23             MR. BAKER:  Your Honor, next I would like to

24   call Sergeant Jesse Luebke.

25             THE COURT:  All right.  Mr. -- Mr. Baker,

1    I've got a matter that I need to take up at 3 o'clock.

2    What I -- oh, okay.  Never mind.

3              MR. BAKER:  This will be pretty quick.

4              THE COURT:  That's all right.  Thank you.

5              MR. BAKER:  Thank you, Your Honor.

6                        **JESSE LUEBKE**

7    called as a witness, after having been first duly sworn,

8    testified as follows:

9              COURTROOM DEPUTY:  Could you please state

10   your name for the record.

11             THE WITNESS:  Jesse Luebke.

12             COURTROOM DEPUTY:  Could you please spell

13   your last name.

14             THE WITNESS:  L-u-e-b-k-e.

15             COURTROOM DEPUTY:  Thank you so much.

16   Please have a seat.

17                    **DIRECT EXAMINATION**

18   BY MR. BAKER:

19        Q.    Sergeant Luebke, thank you for being here

20   today.  What branch of the service are you in, sir?

21        A.    I'm in the United States Army.

22        Q.    How long have you been in the United States

23   Army?

24        A.    12 years.

25        Q.    What is your rank?

1          A.     I'm a staff sergeant.

2          Q.     And what is your job?

3          A.     I am a wheeled vehicle mechanic.

4          Q.     A what?

5          A.     A mechanic.

6          Q.     Okay.  Were you recently stationed in

7     Poland?

8          A.     Correct.

9          Q.     And what other overseas deployments have you

10    been?

11         A.     I have been to Bulgaria, Romania, Germany,

12    Lithuania.  Pretty much everything in Europe.

13         Q.     Okay.  And do you now live in the

14    Clarksville area?

15         A.     I do.

16         Q.     How long have you been back from Poland?

17         A.     I have been back from Poland since the 31st

18    of January.

19         Q.     And how long are you going to be here with

20    us?

21         A.     I will be here for quite a while.  I have an

22    indefinite contract coming up.  I've been in Clarksville

23    since 2018.

24         Q.     So for the foreseeable future you expect to

25    be stationed at Fort Campbell?

1          A.     Correct.

2          Q.     And live here in Tennessee --

3          A.     Correct.

4          Q.     -- with your wife and family?

5                 How many children do you and your wife have?

6          A.     Four.

7          Q.     All right.  How long have you known your

8    father-in-law, Mr. Paul Faye?

9          A.     Four years.

10         Q.     And how well have you gotten to know him

11   during that time?

12         A.     Quite well.  Very well.

13         Q.     What -- what can you tell the Court about

14   what type of person you know your father-in-law to be?

15         A.     Very kind, very generous.  As stated

16   earlier, would give the shirt off his back, help in

17   disaster relief, change a tire, a handyman.  Very, very

18   kind, sweet person.  Just very gullible.

19         Q.     When you say he's gullible, what do you mean

20   by that?

21         A.     He is one to where if information is

22   provided, he will try to almost one-up you.  Like, I

23   deployed and I've seen different types of things in my

24   service.  And he -- it would almost be as if anything

25   that you present, he would have to one up, whether it was

1  maintenance, hunting, fishing.

2          Q.    Does he exaggerate things?

3          A.    Yes.

4          Q.    Okay.  Have you noticed in the last four

5  years that you suspected mental health issues?

6          A.    Yes.

7          Q.    Tell us about that, please.

8          A.    On two different occasions my wife and I

9  have taken him in for what he stated was bugs under his

10  skin.  And then again I was also with my wife when he was

11  admitted into the (indiscernible).

12          Q.    When was that?

13          A.    2022 timeframe.

14          Q.    Let's talk about that for a minute.  What

15  happened in '22?

16          A.    So the first one he went to Tennova

17  Healthcare, and it's on recording that he had identified

18  as he had almost like a bug under his skin, like a

19  scratching, itching.  And that video has been provided.

20          Q.    Okay.  Did he have a bug under his skin?

21          A.    He did not.

22          Q.    What is your understanding about what he's

23  being diagnosed with?

24          A.    It almost would be delusion and maybe --

25  yeah, delusion.

1          Q.    Okay.  If the Court sees fit to release

2     Mr. Faye, will you be available and around to help your

3     wife and to help him --

4          A.    Yes.

5          Q.    -- to comply with the rules?

6          A.    Yes.

7          Q.    Do you believe he would pose a risk of

8     flight, meaning would he take off and not come to court?

9          A.    No, he has no passports and nothing like

10    that.  And then his whereabouts are typically tracked

11    too, so.

12         Q.    Does the family have something called 360?

13         A.    Correct.  That's what I was just mentioning

14    with his whereabouts or tracking.

15         Q.    Tell us about that.

16         A.    360 is an app on your phone and it pinpoints

17    exactly where you are.  That's how we actually found his

18    rental car at the Davidson County courthouse.

19         Q.    That's how you found out where his car was

20    last night?

21         A.    Yes.

22         Q.    So the family tracks each other --

23         A.    Correct.

24         Q.    -- through your devices --

25         A.    Yes.

1     Q.    -- on your GPS on your telephone --

2     A.    Yes.

3     Q.    -- on an app called 360?

4     A.    Yes.

5     Q.    Do you think he's capable of complying with

6  conditions of release?

7     A.    Yes.

8     Q.    Judge will order that he follow all types of

9  conditions, most notably don't break the law and don't

10  use drugs and don't possess firearms.  Can he do all of

11  those things?

12     A.    Yes.

13     Q.    Can you go from time to time to the property

14  in Cunningham and check on him?

15     A.    Yes.

16     Q.    And are you willing to do that?

17     A.    Yes.

18     Q.    Is there anything else you would like the

19  Court to know about whether he should be released?

20     A.    Like I said, superkind, supersweet.  I know

21  the comments that were stated.  Again, that's almost as

22  if the information that is provided and will continue.

23  During the recording it was mainly him just going on and

24  on, one thing would be about food, then it would be about

25  the snowstorm, it would be about the vehicle that was

1  maybe there, maybe wasn't there, so.

2      Q.    Do you -- I mean, you're a soldier for the

3  United States?

4      A.    Correct.

5      Q.    I assume you're very loyal to this

6  country --

7      A.    Yes.

8      Q.    -- and to our constitution?

9      A.    Very much.

10     Q.    And the law?

11     A.    Yes.

12     Q.    Do you fear that your uncle (sic), if he

13  were let out, will try to harm migrants either in

14  Tennessee or at the border or anywhere else?

15     A.    No.  And we've received training for when

16  we've deployed overseas for insider threats and things of

17  that nature too.  And Paul doesn't strike me as one to be

18  an insider threat.

19     Q.    Why didn't that -- why doesn't that

20  recording you just heard make you think that he is a

21  threat?

22     A.    I think he even states on there that he seen

23  a vehicle or if he was concerned about his vehicle being

24  bugged, I think that just further proves that he's not

25  necessarily in his right state of mind.

1          MR. BAKER:  Thank you, sir.

2                **CROSS-EXAMINATION**

3    BY MR. KURTZMAN:

4          Q.    You'd agree, though, that him saying he

5    wants to go to the border and kill people -- you said

6    he's not in the right state of mind.  And then having,

7    what, half a dozen weapons, that's probably not good;

8    right?

9          A.    It's not illegal to own weapons.

10         Q.    What's that?

11         A.    It's not illegal to own weapons.

12         Q.    That's not my question.

13         A.    Okay.

14         Q.    You said he's not in the right state of

15   mind?

16         A.    Correct.

17         Q.    And he possessed a lot of weapons?

18         A.    Correct.

19         Q.    And no one did anything about that?

20         A.    There have been several attempts.  He's been

21   admitted numerous times and then, as stated earlier,

22   earlier testimony that the weapons were taken from him

23   and that he actually reached out once on his own to seek

24   help as well.

25         Q.    You mentioned -- I spent a couple decades in

1 the Army myself. So you mentioned this insider threat

2 reporting?

3      A.    Correct.

4      Q.    All right. Which takes place, like, once a

5 year and lasts about 30 minutes?

6      A.    We do annual training on it, correct.

7      Q.    Sure. Would you be told to report a soldier

8 who had expressed that they wanted to kill federal

9 agents?

10      A.    Yes.

11      Q.    Would you report a soldier who had firearms

12 and made those same threats?

13      A.    Yes.

14      Q.    But you said your training told you he's not

15 a threat even though he's doing all those things?

16      A.    He has actually reached out to seek that

17 help. That was the difference. The Army would also seek

18 help and enroll you in behavioral health issues as well.

19      Q.    Right. You said you've talked to your

20 father-in-law a fair amount. Did he ever tell you about

21 his friends in Missouri who got arrested after shooting

22 at federal agents?

23      A.    He did not.

24      Q.    Don't you find it interesting that the same

25 undercover who was working on that case, your dad somehow

1   came up with the same plot again that he'd had with

2   Mr. Perry and Odell with this new undercover?

3        A.   So I don't know if that's necessarily the

4   same as one of them actually attended the border and

5   actually stated by the individual here that an individual

6   who actually went to the border wasn't arrested --

7        Q.   You're confusing people.

8        A.   Okay.

9        Q.   Mr. Perry and Mr. Odell were arrested in

10  Missouri --

11       A.   Okay.

12       Q.   -- after they opened fired on the FBI.

13       A.   Yes.

14       Q.   Your dad was planning -- or your

15  father-in-law was planning to go to the border with them

16  before they were confronted by the FBI.  Okay?

17       A.   Okay.

18       Q.   That occurred in October of 2022.  Beginning

19  in March of 2023, just a few short months later, he's

20  again planning with the undercover agent, talking about

21  going to the border and what they have to do.  You don't

22  think that's a threat that after his friends are arrested

23  he then goes back to the same plan four months later?

24       A.   I believe that he is not in the right state

25  of mind.  But, yes, the actions are wrong, correct.

1          Q.    You'd agree that mass shooters are not in
2     the right state of mind; right?
3          A.    Absolutely.
4               MR. KURTZMAN:  Thanks.  No further
5     questions.
6               THE COURT:  Were those statements, like what
7     you heard in the recording, were those things you'd ever
8     heard him talk about before?
9               THE WITNESS:  No.
10               THE COURT:  Did he talk about politics?
11               THE WITNESS:  So he would talk about
12     politics, but never in, like, a violent outburst or
13     anything of that nature.
14               THE COURT:  Did he talk about issues at the
15     border?
16               THE WITNESS:  Not to me, Your Honor.
17               THE COURT:  He never expressed to you his
18     concern about the things happening at the border?
19               THE WITNESS:  Just other than what was
20     typically in the news, but not as an actual personal
21     vendetta or anything like that, Your Honor.
22               THE COURT:  What did he say?  What kind of
23     stuff was he saying?
24               THE WITNESS:  That the border crisis is an
25     issue and that we have governors and elected officials on

1  one side versus the bigger government on the other side.

2           THE COURT:  Versus what's on the other side?

3           THE WITNESS:  Versus a bigger government on

4  the other side, essentially two governments butting

5  heads.

6           THE COURT:  Did he express what he thought

7  about that?

8           THE WITNESS:  Not to me, Your Honor.

9           THE COURT:  Okay.  And you were gone -- were

10 you gone in November?

11          THE WITNESS:  Yes, I was deployed, correct.

12          THE COURT:  When did you start your most

13 recent deployment?

14          THE WITNESS:  In May.

15          THE COURT:  All right.  And were you

16 communicating with your wife about your father-in-law

17 during the time that you were away?

18          THE WITNESS:  Correct.  I know that she

19 seeked for him to get mental health.

20          THE COURT:  Okay.  And was that because she

21 felt like something was different than the way it had

22 been with him in the past?

23          THE WITNESS:  From my understanding, the

24 family was concerned and were seeking him to get the help

25 that he needed.

```
1              THE COURT:  Okay.  All right.
2              Any redirect?
3              MR. BAKER:  No, Your Honor.
4              THE WITNESS:  All right.  Thank you,
5    Sergeant Luebke.  Appreciate your testimony.
6                 *****WITNESS EXCUSED*****
7              MR. BAKER:  Your Honor, our final witness is
8    Ms. Rita Pepper.
9              THE COURT:  All right.  Ms. Pepper, if you'd
10   step up, please, and be sworn.
11                      RITA PEPPER
12   called as a witness, after having been first duly sworn,
13   testified as follows:
14             COURTROOM DEPUTY:  Could you please state
15   your name for the record and spell your first and last
16   name.
17             THE WITNESS:  Rita Pepper.  R-i-t-a,
18   P-e-p-p-e-r.
19             COURTROOM DEPUTY:  Thank you so much.
20   Please have a seat.
21                  DIRECT EXAMINATION
22   BY MR. BAKER:
23        Q.   Hello, Ms. Pepper.
24        A.   Hi.
25        Q.   Ms. Pepper, what's your relationship to Paul
```

1    Faye?

2          A.    I'm his ex-wife.

3          Q.    Okay.  Could you speak up just a little bit?

4    I'm hard of hearing.

5          A.    His ex-wife.

6          Q.    How long were y'all married, Ms. Pepper?

7          A.    18 years.

8          Q.    About when did you get divorced?

9          A.    2007.

10         Q.    All right.  What is your relationship now?

11   Are you friends?

12         A.    Yeah, we're better friends now than we was

13   when we was married.

14         Q.    Okay.  And do you live on property together

15   in Cunningham, Tennessee?

16         A.    Yes.

17         Q.    Okay.  You live in which structure on that

18   property?

19         A.    I live in the house.

20         Q.    And where does Paul stay?

21         A.    In the trailer.

22         Q.    How far apart are those buildings?

23         A.    Shoot, I don't know.  What, 200 feet?

24         Q.    Okay.  So they're close by each other?

25         A.    Yeah.

1        Q.    Do you see each other every day?

2        A.    Oh, yeah.

3        Q.    Okay.  Are there any butane tanks scattered

4 about the property?

5        A.    No.

6        Q.    Were there -- are there some propane tanks?

7        A.    There's propane.

8        Q.    About how many would you guess are out

9 there?

10       A.    I don't know, probably about eight because I

11 have four of my own.

12       Q.    Okay.  What are they used for?

13       A.    Grilling out and heating.

14       Q.    Okay.  What -- how do you heat?

15       A.    We have propane heaters.

16       Q.    In the house?

17       A.    Yes.

18       Q.    So you bring them in and attach them to the

19 heater?

20       A.    Yes.

21       Q.    Who else lives on the property there with

22 you?

23       A.    Me and my brother, Billy.

24       Q.    Okay.  So let me ask you, are you employed?

25       A.    No.  Disabled.

1          Q.     You're disabled?

2          A.     Yes.

3          Q.     You receive SSI disability?

4          A.     Yes, sir.

5          Q.     What is your disability?

6          A.     I've got degenerative disk disease in my

7     back.

8          Q.     Okay.  So you're there all the time?

9          A.     Yes.

10          Q.     Okay.  And is your brother on the property

11     all the time?

12          A.     Yes.

13          Q.     Is he also disabled?

14          A.     He's disabled.

15          Q.     What's his disability?

16          A.     He's got a brain disease.

17          Q.     Is he also in a wheelchair?

18          A.     Yes.

19          Q.     He has difficulty walking?

20          A.     He does.

21          Q.     Okay.  How does he get along with your

22     ex-husband, Paul Faye?

23          A.     They get along great.

24          Q.     Is there anybody else that lives on the

25     property at this time?

1    A.    Just a nephew, Bradley.

2    Q.    Your nephew Bradley?

3    A.    He lives in the house with me.

4    Q.    He stays in the house with you.  And could

5 you raise your hand, sir?  How old is Bradley?

6    A.    19, 20.

7    Q.    Okay.  And does he get along well with

8 his -- with Mr. Paul Faye?

9    A.    Yes.

10    Q.    All right.  Now, the government executed a

11 search warrant on your property on Monday; correct?

12    A.    Correct.

13    Q.    And they took a whole lot of items?

14    A.    Yes.

15    Q.    The firearms and ammunition they took, who

16 did that stuff belong to?

17    A.    Paul and my sons.

18    Q.    Okay.  Your sons and Paul.  Are any of the

19 guns registered to your sons?

20    A.    Yes, I think so, yes.

21    Q.    You think so?  But you're not sure?

22    A.    Registered to my son Joseph, yes.

23    Q.    Okay.  Have you ever known him to try to

24 harm anyone or shoot anyone with those guns?

25    A.    No.

1        Q.    Have you ever known him to be a violent

2  person?

3        A.    Never.

4        Q.    Has he ever been violent with you?

5        A.    No.

6        Q.    Have you ever seen him be violent with

7  anyone else?

8        A.    No.

9        Q.    Now, you heard the Judge ask -- your

10  ex-husband Paul, he talks about politics, doesn't he?

11       A.    Yes.

12       Q.    And does he talk about the border?

13       A.    I haven't heard him say nothing.

14       Q.    But he talks about --

15       A.    (speaking at the same time).

16       Q.    -- he's not a big fan of President Biden;

17  would that be fair to say?

18       A.    Yes.

19       Q.    And he supports Mr. Trump; would that be

20  fair to say?

21       A.    Yes.

22       Q.    Does he spend a lot of time watching Fox

23  News?

24       A.    I don't know.

25       Q.    You don't know, okay.

```
1          A.    I know he watches TikTok.  I don't know
2    about --
3          Q.    Oh, he watches TikTok?
4          A.    Yes.
5          Q.    All right.  Ms. Pepper, are you -- are you
6    concerned that if your ex-husband were released that he
7    would try to follow through with this plot that those
8    folks have been describing?
9          A.    No.
10         Q.    Is he going to try to hurt anyone?
11         A.    No.
12         Q.    Especially now that he's under the watchful
13   eye of this court?
14         A.    Right.  No.
15         Q.    If he's released, will he follow the
16   conditions the judge puts on him?
17         A.    He will.
18         Q.    Why do you say that?
19         A.    Because he -- he don't want to hurt nobody.
20         Q.    Okay.  Well, do you think he wants to --
21   and --
22         A.    Huh?
23         Q.    Go ahead.
24         A.    He just -- I know he don't want to hurt
25   nobody.
```

1          Q.     How do you know that?

2          A.     Because he's never been one to hurt someone.

3          Q.     Okay.  He's never -- he's got no criminal

4     record; correct?

5          A.     Right.  No.

6          Q.     Would you be willing to serve as a

7     third-party custodian?

8          A.     I will.

9          Q.     And do you think you understand what that

10    means?

11         A.     Yes.

12         Q.     And what does that mean?

13         A.     To make sure he gets to his appointments and

14    stuff to see the probation officer and all that.

15         Q.     Okay.  If he were to break the Judge's

16    rules, what would you do?

17         A.     I would turn him in.

18         Q.     Okay.  Would you report him to his probation

19    officer?  Would you show any hesitation on doing that?

20         A.     No.

21         Q.     Are you hopeful that the Judge will release

22    him into your custody?

23         A.     I am.

24         Q.     And will you make sure he comes to court and

25    follows the rules?

1       A.      I will.

2               MR. BAKER:  All right.  Thank you, ma'am.

3               THE WITNESS:  Thank you.

4                       **CROSS–EXAMINATION**

5   BY MR. KURTZMAN:

6       Q.      Ma'am, you said that you and Mr. Faye are

7   close friends?

8       A.      Yes.

9       Q.      So you talk to him every day?

10      A.      Every day.

11      Q.      Okay.  Did he ever tell you about his

12  friends in Missouri who got arrested?

13      A.      About Bryan.

14      Q.      What did he tell you?

15      A.      Just that he had got arrested.  He didn't

16  say why or nothing.

17      Q.      Okay.  Didn't tell you why?

18      A.      No.

19      Q.      Just said that they got arrested?

20      A.      Yes.

21      Q.      So you didn't know that they had shot at FBI

22  agents as they were trying to do a search warrant like

23  they did at your house?

24      A.      I didn't.

25      Q.      When the FBI came to your house, they just

1  knocked on the door; right?

2       A.    Huh?

3       Q.    When the FBI came to execute the search

4  warrant, they just knocked on the door; right?

5       A.    No, they didn't just knock on my door.

6       Q.    What did they do?

7       A.    They hollered over the intercom for me to

8  come -- for everyone in the house to come out with their

9  hands up.

10       Q.    Okay.  Did you do that?

11       A.    Yes.

12       Q.    You said you talk to Mr. Faye every day.

13  You knew about his friends in Missouri getting arrested,

14  but you didn't know what for?

15       A.    No.

16       Q.    And now that I told you that they were

17  plotting to go to the border to shoot migrants and border

18  patrol agents, that doesn't concern you at all that he

19  hid that from you?

20       A.    Not really.  He's never -- I know he's not a

21  violent person, so.

22       Q.    Okay.  But you said his friend Bryan -- his

23  friend Bryan was charged with assaulting a federal

24  officer and that he tried to kill them by shooting at

25  them.  And he just told you his friend was arrested?

1      A.    Uh-huh (affirmative).

2      Q.    The fact that he hid that he was plotting

3 with them to also go to the border back in late 2022,

4 that doesn't give you concerns?

5      A.    No, because he's not -- I know he's got

6 mental problems.

7      Q.    Okay.  You agree that people with mental

8 problems, like any one of us, though, could commit a

9 crime; right?

10      A.    Well, yeah.

11      Q.    Okay.  So Mr. Faye joined in the same type

12 of planning again this past year with the undercover to

13 again go to the border to commit acts of violence.

14 Doesn't that concern you that after his friends are

15 arrested he goes back and sort of reengages in the same

16 conduct?

17      A.    Again, I just -- it's the mental -- I feel

18 it's just because of him being mental.

19      Q.    Right.  But don't you think somebody that

20 struggles with mental health like Mr. Faye, they could

21 commit an act of violence; right?

22      A.    Sure.

23      Q.    Did he talk to you about his plans to go to

24 Texas?

25      A.    No.

1      Q.    Did he talk to you about his communications

2   with Greg Gibson?

3      A.    No.

4      Q.    And Greg Gibson's militia leader in

5   North Carolina and Mr. Faye never told you about that?

6      A.    No.

7      Q.    Doesn't all that make you concerned that he

8   was actually planning to go to the border?

9      A.    No, because I've heard him say to people

10   that's tried to get him to go to the border with them and

11   him tell them no.

12      Q.    Who's that?

13      A.    I don't know who.  I just -- I've heard --

14      Q.    You said you've heard conversations?

15      A.    On the phone, yeah, but I didn't know who it

16   was.

17      Q.    Who was he talking to?

18      A.    I don't know, I didn't ask him who he was

19   talking to.

20      Q.    But he never mentioned Mr. Gibson to you?

21      A.    No.

22      Q.    Did he ever mention the undercover agent

23   from Knoxville?

24      A.    No.

25      Q.    Did you ever hear him go by Gunny in these

1   conversations?

2           A.      No.

3                   MR. KURTZMAN:  No further questions.

4   Thanks.

5                   THE COURT:  Ms. Pepper, so I imagine it

6   could be a little challenging to strike a balance between

7   living on the same property with your ex-husband and not

8   getting in his business at the same time; right?

9                   THE WITNESS:  Yeah.

10                  THE COURT:  And is that kind of what you

11  tried to do was try to --

12                  THE WITNESS:  Try to stay out of it.

13                  THE COURT:  -- coexist but not really get

14  involved in his business?

15                  THE WITNESS:  Right.

16                  THE COURT:  How long have you had concerns

17  about his mental health?

18                  THE WITNESS:  For a few years now.

19                  THE COURT:  And were you involved in the

20  discussions and actions taken that your daughter

21  described about -- and your son-in-law about him going to

22  the hospital because of these bugs under his skin and

23  going to the Pine Woods or whatever it was?

24                  THE WITNESS:  Yes.

25                  THE COURT:  Were you involved in that?

1          THE WITNESS:  Yes, sir.  I actually went to

2     the hospital with them in Springfield.

3          THE COURT:  Okay.  And what about the most

4     recent committal that happened?  Were you involved in

5     that?

6          THE WITNESS:  That was from Springfield.

7          THE COURT:  That was from Springfield, okay.

8     All right.  And so he kept a lot of things from you, and

9     you didn't really get engaged trying to find out a lot of

10    things going on in his life; right?

11         THE WITNESS:  Right.

12         THE COURT:  And sort of chief among that was

13    all this stuff we've heard about, we heard this telephone

14    recording.  Do you know anything about that?

15         THE WITNESS:  No.  He knows I'm not into the

16    political sense, so any -- if he did even say anything

17    about it, I would -- I don't want to hear it.  I don't

18    want to hear about it.  I'm not political.

19         THE COURT:  Uh-huh (affirmative).  So, I

20    mean, if -- if he were released and you were his

21    third-party custodian, how would -- how would you be able

22    to assess whether or not there was something to be

23    worried about or concerned about?

24         THE WITNESS:  Well, he still talks to me

25    about everything, you know.

1          THE COURT:  Just not that stuff.

2          THE WITNESS:  Not that stuff, yeah.

3          THE COURT:  So that's the stuff we're

4    worried about and he ain't gonna talk to you about it.

5    How is that really protecting that he won't get all

6    worked up and his mental health issues cause him to act

7    on it?

8          THE WITNESS:  Uhm.

9          THE COURT:  Yeah.

10          All right.  Mr. Baker, you want to follow

11   up?

**REDIRECT EXAMINATION**

13   BY MR. BAKER:

14        Q.    Well, you certainly -- if he is released,

15   can you promise the Court that you will see him every

16   day?

17        A.    Yes.

18        Q.    And that you will -- you will be aware of

19   all of the conditions that he has to follow?

20        A.    I will.

21        Q.    And if he breaks any one of those

22   conditions, will you report him to his probation officer?

23        A.    I will.

24        Q.    If you hear him discussing politics about

25   the border or about guns or about immigrants, will you

1  report him to the probation officer and call me and tell

2  me as well?

3        A.    I will.

4              MR. BAKER:  That's all, Your Honor.

5              THE COURT:  Mr. Kurtzman, anything you want

6  to follow up on my questions?

7              MR. KURTZMAN:  No, Your Honor.

8              THE COURT:  All right.  Thank you,

9  Ms. Pepper.  I really appreciate you being here.  Thank

10  you for your testimony.

11                  *****WITNESS EXCUSED*****

12              MR. BAKER:  Your Honor, could I have just a

13  moment, please?

14              THE COURT:  You may.

15              MR. BAKER:  Your Honor, no further

16  witnesses, but I would like to make a proffer.

17              THE COURT:  All right.  You may.

18              Mr. Baker, you're welcome to stand like that

19  if you want to.

20              MR. BAKER:  I'll turn around.

21              THE COURT:  If you want to swing that

22  around, you can do that too.

23              MR. BAKER:  Thank you, Your Honor.

24              THE COURT:  Thank you.

25              MR. BAKER:  I was trying to gather my

1  thoughts here a little bit.

2          THE COURT:  I understand.

3          MR. BAKER:  Your Honor, in terms of the

4  proffer, I'd like to make a proffer on behalf of Mr. Paul

5  Faye.  And that proffer is as follows:  That he

6  recognizes he has mental health problems and that he

7  needs treatment.  He wants treatment.  He will comply

8  with treatment.  He wants to assure this Court that if he

9  is released, regardless of whatever crazy statements that

10  he has made in the past, that he is not serious and he is

11  not going to go to the Mexican border and try to harm

12  agents or immigrants, nor will he try to harm any

13  immigrants or agents here in Tennessee.

14          He wants the Court to know that if the Court

15  gives him the opportunity to be released, he'll comply

16  with all the conditions of his release and that he will

17  continue going to outpatient treatment and take his

18  medication.  And that he is not a danger.  He wants the

19  Court to know that he is not a danger and he'll comply.

20          That's all, Your Honor.

21          THE COURT:  All right.  Thank you.

22          MR. KURTZMAN:  Your Honor, can Mr. Baker and

23  I approach?

24          THE COURT:  I'm sorry?

25          MR. KURTZMAN:  Can Mr. Baker and I approach?

1          THE COURT:  Yeah, sure.

2          (Bench conference held off the record.)

3          THE COURT:  All right.  We're going to

4     take -- we're going to take a short recess.  I have

5     another matter that I need to tend to at 3:30.  You-all

6     are welcome to stay in the courtroom, but if you need to

7     have any conversations, I'd ask you to please take that

8     outside.  We'll take up -- I'll take up my other matter

9     and then we'll -- we'll reconvene and I'll hear from the

10    parties in terms of argument and we'll go from there.

11    Thank you.

12          (Whereupon, a break was taken.)

13          THE COURT:  Thank you, you can be seated.

14          All right.  We're back on the record after a

15    short break.  I appreciate everybody's patience.  Any

16    other proof before we get argument, Mr. Kurtzman?

17          MR. KURTZMAN:  No, Your Honor.

18          THE COURT:  Mr. Baker, anything else?

19          MR. BAKER:  No, Your Honor.

20          THE COURT:  All right.  Very good, thank

21    you.

22          Mr. Kurtzman, I'll hear from the government.

23          MR. KURTZMAN:  Your Honor, all the

24    Section 3142 factors here weigh in favor of detention.

25    When you look at the nature and circumstances of the

offense at issue here, as the FBI conducted an 18-month
investigation into individuals planning to commit acts of
violence on the border, they encountered Mr. Faye in two
of those investigations.

The offense here, which is the suppressor,
isn't related to that conduct.  And the only reason it's
not is because law enforcement deemed Mr. Faye to be such
a danger to the community based on his own statements,
some of which were played today, that it had to arrest
him in the most efficient and timely manner in order to
get him off the street.

That's why there's not a larger conspiracy
to assault federal officers charged here is, quite
frankly, law enforcement couldn't wait for the evidence
to develop anymore.  They had a threat that they were at
significant risk if Mr. Faye ever encountered them.

We knew he was going to encounter them
because we had been investigating him and he'd been
engaged in criminal conduct.  That's why when you look at
the nature of the events, I think we can also look --
that's also informed by looking at the steps the FBI took
to bring Mr. Faye into custody.

They knew he was going to be at the
courthouse.  They coordinated with that -- with the
courthouse in order to ensure that he was going to be

1  there.  They then observed him traveling down there and
2  then took him into custody only after he was -- he had
3  gone through the metal detector.  Only then did law
4  enforcement then go to his home because he had told them
5  it was booby trapped and that he planned to commit acts
6  of violence if he was ever confronted there.  And he was
7  equipped to do so with numerous firearms that we've
8  discussed, the short-barreled shotgun, the suppressors,
9  and significant amounts of ammunition for each of those
10  firearms.
11          When we look at the history and
12  characteristics of the defendant, that also weighs
13  heavily in favor of detention.  When I look at his
14  history and characteristics, let's look just in the past
15  couple years what he's done.  He was conspiring with
16  Mr. Perry and Mr. Odell to go down to the border.
17          Mr. Perry and Mr. Odell actually shot at
18  federal law enforcement, as the defendant said he would,
19  when they were confronted and then now pending trial in
20  April of this year in the Western District of Missouri.
21          Mr. Faye knew that they went to jail, and a
22  simple Google search would tell you why they went to
23  jail.  He's still communicating with them, and then
24  months later, after we identified that Mr. Faye was the
25  co-conspirator of those two individuals, an undercover

1    attempted to contact Mr. Faye and was successful.  And

2    then they began talking about training and talking about

3    going to the border, just like Mr. Faye had done with

4    Mr. Perry and Odell.

5            I know Mr. Baker will paint him as -- I

6    believe he called him delusional at one point, and

7    there's been a lot of discussion of Mr. Faye's mental

8    health.  He was involved in one conspiracy with Mr. Perry

9    and Odell and just a few months later, after his friends

10   had been arrested, he was right back doing the same

11   thing, preparing to do the same thing again.

12           Your Honor, we talk about the danger to the

13   community.  No one close to Mr. Faye knew that he'd

14   entered these two plots.  They knew he had mental health

15   concerns for him.  And based on his own statements, I

16   think those concerns are valid.  No one says that they

17   come into the world with the blood of someone else on

18   them and they're going to go out the same way.  That's

19   not something that a mentally healthy person says.

20           But that is the type of rhetoric and conduct

21   and conspiratorial plotting that Mr. Faye has done since

22   October 2022.  If released again, there's nothing to say

23   that he's not going to try to get into a third conspiracy

24   to go to the border and commit these acts.

25           The danger to the community.  Law

 1    enforcement has an incredibly hard job in the border

 2    area.  There are reports of being understaffed, conflicts

 3    between federal, state and local authorities, and

 4    individuals like Mr. Faye and others -- and Mr. Gibson,

 5    who Mr. Faye was also conspiring with to go down there

 6    and commit acts of violence, either targeting migrants or

 7    law enforcement officers just attempting to do their job

 8    in protecting our southern border.

 9            The danger to the community there is strong.

10    I don't think -- while Mr. Faye's daughter, son-in-law

11    and ex-wife are all law-abiding people, I don't think any

12    of them have the sufficient resources and ability to

13    monitor him in a way that would give the Court confidence

14    that any conditions of release would be appropriate and

15    would ask that he be detained pending trial.

16            THE COURT:  Hang on, Mr. Kurtzman.  I want

17    to ask you a question.  So -- I don't know how it

18    relates, and maybe you'll tell me it doesn't, but I'm

19    struggling a little bit with Mr. Gibson, who I heard all

20    this testimony about and his alleged conspiracy and

21    all -- plotting and recruiting efforts that he made, and

22    then he actually goes to the border and doesn't get

23    arrested, charged with anything at all.

24            And then you have somebody who never does

25    that, never takes that kind of substantial step, and --

he's got a different charge, but it's the same underlying

conduct that you're arguing dangerousness for.  And then

I'm trying to -- trying to grapple with the disparity

between that conduct and what to do here.

MR. KURTZMAN:  So...  Trying to think of a

way to answer you.  I'm going to have to -- I think the

question you've asked, I'm going to have to tell you

things that I did not introduce into evidence here.

THE COURT:  Uh-huh (affirmative).

MR. KURTZMAN:  But I think to inform you so

you understand, I think it's probably fair to do so.

Mr. Gibson coordinated a multistate call amongst militia

leaders talking about their travel to the border.

Mr. Faye was invited to that as the leader of the

Tennessee arm of this multistate militia.  Or multistate

group of militias, we'll say.

Mr. Gibson then pitched to everyone that he

was going to do a reconnaissance visit, which is the

visit he went on.  Law enforcement monitored him the

entire way from North Carolina, all the way there and

back.  He was interdicted at one point.  And essentially

told -- he's also driving an out-of-state vehicle and he

was told to leave.  Those are the text messages that you

see that were produced in Exhibit 2.  All of -- there's

a -- when the Court looks through, there's a number of

1   unreadable text messages.  It's just gobbledygook.  And
2   then there's those two.
3            THE COURT:  I saw.
4            MR. KURTZMAN:  All of that garbled nonsense,
5   those are all text messages between Greg Gibson and
6   Mr. Faye that were encrypted.  So that is how we got them
7   on the electronic portion of the wiretap.  I don't know
8   why those two messages did come through.  I don't know
9   what happened, but all those other messages from that
10  same number are all Mr. Faye talking to Mr. Gibson, who's
11  on the ground in Texas.
12           As Mr. Faye put -- in this persona of Gunny
13  put himself forward as a leader of the Tennessee group
14  into which he recruited the undercover.  So the
15  undercover -- maybe towards the end was authorized to
16  talk directly to Mr. Gibson, but Mr. Faye was that
17  intermediary because Mr. Gibson was the leader of the
18  multistate group and Mr. Faye was the leader of
19  Tennessee.
20           THE COURT:  I don't remember any testimony
21  about Mr. Faye's relationship to any larger militia group
22  in Tennessee.  Did I -- is my memory faulty or?
23           MR. KURTZMAN:  There's testimony regarding
24  the Second American Militia, which is what Mr. Perry and
25  Mr. Odell were part of.

1          THE COURT:  Right.

2          MR. KURTZMAN:  And we're still investigating

3    who else may or may not be a part of that.

4          THE COURT:  Okay.  All right.  That's fine.

5          MR. BAKER:  Your Honor, I want to start out

6    by addressing the timeline, because I don't think it

7    makes a lot of sense.  So we've heard testimony that it

8    was an 18-month investigation, so that would put us back

9    in the summer of '22.  October of '22, I guess that's

10   what they're referring to.

11         The testimony we heard from this agent today

12   is that he started investigating Mr. Faye around March of

13   '23.  And I pointed out there's this six-month difference

14   between October when Perry's arrested in Missouri along

15   with Odell.  But the government's -- I mean, they're

16   alluding to he's had communications with them, but we

17   have no evidence of what those communications were or

18   that Mr. Faye was in any way planning to go with Bryan

19   Perry to the border or knew that Bryan Perry would shoot

20   agents.

21         The government assumes that Mr. Faye must

22   have known what happened after Mr. Perry was arrested in

23   Missouri and about the shootout, but we have no evidence

24   of that and I don't think that Mr. Faye did know about

25   that at that time.

1          The government says he could have Googled
2     it, but there's no evidence that he did do so.  So we
3     just don't know really what that connection was, if
4     anything.  And, you know, it's kind of like we've got
5     some guilt by association going on in this courtroom
6     today.  Look at these guys, they shot at agents, as if
7     that somehow proves that Mr. Faye would do the same
8     thing.  It doesn't, Your Honor.  It absolutely doesn't.
9          I believe Mr. Perry may have a prior
10    criminal record as well, unlike Mr. Faye who's always
11    been a law-abiding citizen.  I mean, if Mr. Faye was
12    going to go to the border during this 18-month
13    investigation, the government -- we've learned that he
14    had an automobile that worked before it broke down after
15    the wreck in January of this year.
16          He could have gone to the border armed with
17    these guns that apparently belong to his family that are
18    found in the trailer, but he didn't go.  There's no -- he
19    didn't go to Texas, he didn't go to North Carolina, he
20    didn't go to Missouri, he didn't go anywhere.  He hasn't
21    done anything, other than run his mouth.
22          We know that Mr. Faye suffers some mental
23    health issues.  It's the kind of mental health issues
24    that make people delusional.  People that have mental
25    health issues sometimes talk out of their you-know-what

1  and say things they don't necessarily mean, especially if

2  they're getting ginned up and jazzed up by undercover

3  agents who are desperate to somehow make a connection

4  here and talk to a man who's mentally ill and get him to

5  say things that make it seem like he's dangerous.

6          But there's no proof that he would have

7  actually done any of these things, Your Honor.  And I've

8  heard this Court say many times, the best way to judge

9  somebody's future behavior is to look at their past

10 behavior.  A man with no record of violence, who's a

11 peaceful man, who's loved by his family, they all say

12 he's peaceful, he's not violent.  And he's never been

13 charged with anything violent, much less convicted.  So

14 that's who stands before this Court today.

15          Your Honor, the 3142 factors weigh strongly

16 in favor of release in this case.  In determining whether

17 a person has been released, we've got to look at the

18 nature and circumstance of the offense charged.  What

19 we're charged with is a regulatory offense, failure to

20 register a suppressor.

21          Now, the government will argue that the

22 offense does involve a firearm.  A firearm is a -- a

23 suppressor is defined as a firearm and the government has

24 produced a report stating that that device is a, quote,

25 suppressor.

1          The weight of the evidence against the

2     person.  It's the weight of the evidence of

3     dangerousness.  The only evidence of dangerousness are

4     the rantings of a mentally ill man.  Not a single witness

5     can come forward before this Court and point to any

6     actual evidence that Mr. Faye was going to participate in

7     trying to harm agents or immigrants at the border.

8          Now, as far as the border goes, Your Honor,

9     as far as I know, it's not illegal to go down to the

10    Mexican border.  In fact, I believe there's other militia

11    groups -- the news reports that there are militia groups

12    at the border now.  The issue is, what's legal and what's

13    not legal.

14          Sounds like they've arrested somebody at the

15    border in one of these militia groups because they found

16    out he was a prohibited person.  But there's plenty of

17    law-abiding American citizens who are upset about what's

18    going on at the border who think that they should go and

19    help law enforcement, or if there is a terrorist attack,

20    help defend the country.

21          Now, when you go through the statements he

22    makes that are in the line sheets, as well as the

23    complaint, I would ask you to consider, Your Honor, that

24    a delusional man with mental health issues who's

25    listening too much to certain individuals and their

overheated rhetoric in the news media about the border
and about the invasion that's happening to this
country -- Senator Marco Rubio was on the news yesterday
morning talking about it's the Democrats' plan to bring
immigrants from the border to turn them into voters for
the government and they're going to take away this
country and that they're bringing a socialist government
to this country.  That's what this man's listening to and
getting himself all worked up and jazzed up because he
doesn't understand it.

          We know that's not what's really going on.
We have a humanitarian crisis at our border.  Mr. Faye is
a loyal American.  It may very well be that what he's
talking about is going to assist law enforcement if there
is a terrorist attack across the border.  That's what he
thinks is going to happen.

          And how do we know that, Your Honor?  Think
about the words that were used on the audio recording of
Mr. Faye talking to the undercover that we heard today.
At one point the agent says something about, yes, there's
going to be terrorism.  He says, no, the terrorists are
going to come across the border.  The agent's trying to
get them to say that they're going to be the terrorist
shooting people coming across the border.  Mr. Faye's
trying to tell him that if we don't control this border,

1  terrorists are going to come across it to commit jihad or

2  to attack this country.

3         Your Honor, this is a man who's always been

4  a law-abiding citizen, who's never carried out a violent

5  act, who has some delusional beliefs based on political

6  issues that are going on.  He doesn't need to be locked

7  up in a jail.

8         Your Honor, we're certainly going to have

9  him evaluated.  We hope that we can have him evaluated

10 while he's on release in this case living in Cunningham,

11 Tennessee.  There's no more weapons out there, the

12 government's taken them all.  There are conditions that

13 can assure his appearance in this courtroom.

14         The next factor, history and characteristics

15 of the person, the person's character.  You've heard

16 about all the good things that he's done.  This is not a

17 bad man.

18         His physical and mental condition.  A man

19 with mental health issues.  Family ties, strong family

20 ties, community ties.  Past conduct.  Whether at the time

21 of the offense he was on probation or parole; he's not.

22         The nature and seriousness of the danger to

23 any other person.  Your Honor, if the government was

24 worried about the safety of the community, they've done a

25 good job.  They've arrested Mr. Faye.  And now we can all

be assured.  But he doesn't have to continue to be locked

up.  As I said before, if he wanted to travel to the

border and commit acts of violence, he certainly had the

last -- at least since March of '23 when they started

talking to him to do it.

Then if the government was really so

concerned that this was an imminent danger, this

telephone call they played for you today was on

January 22.  And I submit to you that when Paul Faye said

I'll go out with blood on my body the way I came in, he's

talking about if there's a war that he gets involved in,

in his delusional mind, because terrorists are coming

across the border.

From November -- from January 22 till

November 5 (sic), 16 days.  Doesn't seem like such an

imminent threat.  They let him stay in the community for

16 days.  The reason is it wasn't an imminent threat

because he's not an imminent threat.  He's not going to

do anything if you release him, Your Honor, except comply

with the rules of his release, take his medication and

stay out of trouble.

Your Honor, I'd respectfully submit that the

conditions that can assure both the safety of the

community and his appearance are strict conditions.

Electronic monitoring.  We'll know where he is.  I

understand your concerns about Rita Pepper not knowing everything that he's doing. But Rita Pepper is a good third-party custodian because she will report him if he messes up. If he leaves that property, she'll report him. If he does what he's not supposed to do, she'll report him.

Electronic monitoring, we can be assured of where he is. The fact is that all the weapons are gone and we can be assured that they will be fine. The probation officer can go to the property and search it if they want to.

He needs to continue, as a condition, with community mental health treatment. Your Honor could also order him to stay off of social media, particularly TikTok.

Paul Faye has never been in jail before, Your Honor, and this last week has been really hard on him. The jail doesn't give him the medication the way they're supposed to. Being in jail is really tough for someone that's never done it before. This is not a man that needs to be locked up.

So, Your Honor, we respectfully request that the Court find that the factors weigh in favor of release and release Mr. Faye. And I feel confident that the Court can be assured that the community will be protected

1   and Mr. Faye will appear and will apply -- comply with

2   his conditions of release.

3           MR. KURTZMAN:  Just a couple things,

4   Your Honor.

5           Mr. Baker referenced the tie between

6   Mr. Faye and Mr. Perry.  We know about that -- the tie

7   between them because it was in Mr. Perry's phone, and

8   that's what led to the initiation of the investigation

9   into Mr. Faye is because they'd been plotting and

10  planning together to go to the border --

11          MR. BAKER:  Objection, Your Honor.  We

12  know -- something's in his phone?  There's no evidence

13  that he was plotting with Perry.

14          THE COURT:  He's arguing.  I'll let him

15  argue, and I'll give it the weight it's worth.

16          MR. BAKER:  Yes, Your Honor.

17          MR. KURTZMAN:  Your Honor, the FBI doesn't

18  open domestic terrorism investigations into individuals

19  just because they're in someone else's phone.  They open

20  an investigation because he was plotting to go to the

21  border with Mr. Perry and Odell.  He had met with them

22  beforehand, and they were planning to go down until

23  Mr. Perry and Mr. Odell shot law enforcement.

24          Mr. Baker talks about other militias at the

25  border.  He's right, there are other militias down there.

All of them have told Gibson he's too violent to be a
part of their legitimate militia.  Property owners along
the border allow these militias to come and stay on their
property.

And Gibson has been told by those somewhat
legitimate law-abiding militias that are helping people
down there that Gibson is not to come.  He's not to stay
with them.  He's not to associate with them.  It's
because they're advocating for violence, they're not
advocating for the protection of our border.  Mr. Faye
and others are advocating for violence.

And then Mr. Baker says, he could have gone
to the border any time over the course of this 18 months.
Well, he's plotting in '22.  His friends went to jail.
Didn't do anything for a few months.  And then in March
he starts talking to the undercover and starts planning
again.

When the FBI wiretap began, we knew the
defendant and Mr. Gibson had selected a date for which
they were going to go to the border.  Massive ice storm
hit the Middle District of Tennessee and it hit
North Carolina, and it pushed those plans.  Mr. Gibson
went on a recon visit.  He was planning to go to the
border.  He was planning to go to the border with
Mr. Gibson right about the time he was arrested,

Your Honor.

Gibson had selected dates and Faye said he would go just as soon as his truck was ready to go. And the quotes -- it's in Exhibit 2, you can read it, he's talking about people that he believes are federal agents surveilling him and his quote is: All I can tell you, all I can tell you is if they come, they better come fucking hard. They better come ready because I am. The undercover responds, yeah.

And then Faye says: I'm not saying I can beat them all, but I guarantee you I'll put enough of them down. I've had enough of their bullshit. He's talking about law enforcement, Your Honor.

It could be related to mental health, but the proposed plan for his release doesn't account adequately for the mental health concerns that Mr. Baker has raised and may or may not be present. What we can see in black and white is exactly what the defendant said he planned to do and exactly what he was prepared to do when he got there and what he would do to federal law enforcement if encountered.

The proposed conditions don't account for that. The Court looks at would it be safe for a probation officer to go visit someone who's expressed these feelings about federal law enforcement. And the

1   answer is no.  Are there conditions that could safeguard

2   against that?  I believe the answer again is no and would

3   ask the Court to detain Mr. Faye pending trial.  Thank

4   you.

5          THE COURT:  Let me just clarify one thing.

6   I think that you said the danger to the community of

7   Mr. Faye's release would be that he would engage in

8   another conspiracy like the two he'd previously engaged

9   in to eventually get to the border and take some

10  nefarious actions against migrants and law enforcement

11  there.  Is that -- is that the danger that I need to

12  protect the community from?

13         MR. KURTZMAN:  That's one of them,

14  Your Honor.  Also if you look at Exhibit 2, there's ample

15  evidence of him talking about looking for targets in the

16  Tennessee area.  He talked about Knoxville and Memphis in

17  Exhibit 2 about how they need to find where they're

18  shipping the migrants there, because in his mind he

19  believes the fight against these migrants is coming to

20  Tennessee as well.

21         And he expresses that to the undercover as,

22  we may not even need to go to Texas.  We may be able to

23  target these people here at processing facilities.  So

24  that's another one of the dangers is he now believes that

25  he can commit acts against these migrants who he believes

are an army recruited by the Biden administration, he can
commit acts of violence against those people here.

The thing is -- or scary thing is he has no
way of identifying who is a migrant.  He just doesn't.
He told the undercover that the guy who hit his truck is
an illegal.  And that's one more reason why he hates
illegals.  The guy who hit his truck is a life-long
resident of the state of Tennessee named Wayne.  But he
sees targets everywhere.

MR. BAKER:  I have to object to the
testifying without evidence that the government is doing.

THE COURT:  Well, they admitted the line --
I admitted the line sheet in total in this case.  So
he's --

MR. BAKER:  I don't think he's referring to
the line sheets.  I think what he's now saying is beyond
that, is it not, Your Honor?

MR. KURTZMAN:  The Knoxville and Memphis
piece?  No, it's directly in there in the call that
starts on page 12.

THE COURT:  Are you talking about the Wayne
business, though?  Is the Wayne business in the line
sheet?  I just assumed you were referring to things in
the line sheet because I know that Knoxville and
Memphis --

1          MR. KURTZMAN:  That individual is not

2     mentioned anywhere, other than the defendant refers to

3     him as an illegal.

4          THE COURT:  Okay.

5          MR. BAKER:  I thought you just testified

6     that he was upset because an illegal hit him in his car.

7          THE COURT:  Yeah, that's what you just said.

8          MR. BAKER:  Is that in the line sheet?

9          THE COURT:  The line sheet -- as I

10    understand what you just told me in the line sheet is he

11    thought an illegal's who hit him, and you said it wasn't

12    actually an illegal.  It was a guy who lived here all his

13    life named Wayne.

14         MR. KURTZMAN:  And it's not a critical

15    point.  The point is the Court was asking me about what

16    the dangers were that you needed to protect against.

17         THE COURT:  Yeah.

18         MR. KURTZMAN:  And Your Honor said that it

19    was him going to the border and committing acts of

20    violence.  And I'm submitting that it's not.  He now sees

21    targets here, amongst those who live in Tennessee.  He

22    sees federal law enforcement as a target.  I don't know

23    if that extends to all law enforcement, but after an

24    arrest and a search of his property, that's a reasonable

25    conclusion to draw to, that he would have strong negative

feelings toward any member of law enforcement. And would
submit that no conditions can protect the public from
those dangers.

THE COURT: All right. Thank you.

All right. First of all, I want to take a
minute just to thank the lawyers for their efforts.
Appreciate the hard work and advocacy by each of you.
It's important in our system to have strong advocates who
are able to articulate their positions, and I think you
both did an excellent job of that. And it makes the job
of the Court more difficult, but it's also important for
the system to work as it should to have strong advocacy
on both sides of an issue.

I also want to take a minute just to
acknowledge and thank all those folks who have come to
court today to be here in support of Mr. Faye. I
recognize folks that have been here, I think Mr. Baker
introduced most of you along the way. Especially want to
thank the Luebkes and Ms. Pepper for your testimony and
for your willingness to assist the Court in this matter.

You know, there are a lot of people who come
to this courtroom who don't have anybody who's willing to
be there for them, who's going to support them no matter
what happens. And so I know there's just about anywhere
else in the world y'all would rather be on a Monday than

1    sitting in a federal courthouse.  But it means something
2    to me that you-all made the effort and took the time to
3    be here.
4              And so I just want you to know I acknowledge
5    that and appreciate that.  I suspect that my appreciation
6    pales in comparison to Mr. Faye's appreciation that he
7    knows you-all are here for him no matter what happens.
8              With respect to the issue of probable cause,
9    the government's burden to establish probable cause at a
10   preliminary hearing is relatively low.  Probable cause is
11   a reasonable ground for belief supported by something
12   less than prima facie proof but more than just a mere
13   suspicion.
14             The job of the Court is to examine whether
15   probable cause exists, which is more than just a rubber
16   stamp.  In this situation the Court's heard the proof on
17   this matter with respect to the charge that the
18   defendant's been arrested for.  I'm satisfied that the
19   government's met its burden with respect to the charge in
20   the criminal complaint, and I'll make that finding at
21   this time.
22             With respect to the issue of detention, the
23   Bail Reform Act ordinarily requires that a defendant be
24   released pending trial unless there are no conditions
25   that will reasonably assure the appearance of the person

at future court proceedings and the safety of the community.

The Court's to consider a number of factors, including the nature and circumstances of the offense charged, the weight of the evidence against the defendant, the history and characteristics of the defendant and the nature and seriousness of the danger posed by the defendant's release.

In our society, liberty is the norm and detention prior to trial or without trial is the carefully limited exception. and the Court's mindful of the tension between the Bail Reform Act and the presumption of innocence that applies to Mr. Faye and all other individuals who are accused of crimes in this court.

As I note, there are two considerations that I have to take into account. The first relates to nonappearance or flight. I don't think that the issue of flight in this case was seriously argued, but Mr. Faye has long ties to this community. He has a number of folks, as I've already indicated, who are here today to support him.

I heard the testimony of his daughter and son-in-law and ex-wife about their willingness to assist the Court and about the nature of their relationship and

1    his ties to the community.  And I don't believe that

2    there's a serious risk of nonappearance in this case.

3            To the extent there is any concern about

4    nonappearance, based upon the allegations or the charge

5    in this case, I'm satisfied that there are conditions of

6    release that would reasonably assure his appearance at

7    future court proceedings.  So I will not detain him based

8    on a risk of flight in this case.

9            With respect to the risk of dangerousness,

10   in order for a defendant to be preventatively detained,

11   the Court must identify an articulable threat posed by

12   the defendant to an individual or the community.  And

13   while that threat need not be one of physical violence,

14   it must be clearly identified.  The threat's to be

15   considered in context, and determination regarding

16   detention must be made on an individual basis.

17           And then the final analysis must be based on

18   the evidence before the Court regarding the particular

19   defendant, and whether a defendant poses a particular

20   threat depends on the nature of the threat identified and

21   the resources and capabilities of the defendant.

22           In this case, as Mr. Kurtzman articulated in

23   his argument, the danger to the government that the

24   Court's identified -- or rather that the government's

25   identified and argues warrants detention in this case is

the concern about Mr. Faye's alleged involvement in
multiple conspiracies to travel to the southern border
and engage in illegal conduct and dangerous conduct
directed toward migrants generally and border agents or
other law enforcement in the area.

Additionally, based upon the alleged
statements of the defendant, the government also has
expressed concern that his release would pose a danger to
the community with regard to the possibility that such
attacks might occur locally, and specifically Memphis or
East Tennessee, and that if Mr. Faye were to encounter
law enforcement in the future, that that conduct might
result in harm or danger to law enforcement under those
circumstances.

The Court's heard the evidence in this case,
and specifically heard the statements of the defendant in
speaking with the confidential informant and finds that
the statements made by the defendant and his alleged
conduct in this case would create a danger to the
community for the reasons that the government articulates
with regard to the concerns about his statements and his
ability to act on those statements.

However, that's not the end of the inquiry.
The Court must determine, having made that finding,
whether there are conditions that will reasonably assure

1    the safety of the community.  And that's really where

2    this case ultimately has to be resolved is whether or not

3    there are conditions that will reasonably assure the

4    safety of the community.

5            I think Mr. Baker makes some really salient

6    and good points with regard to the nature and

7    circumstances of the offense and the weight of the

8    evidence of dangerousness in this particular case.  This

9    alleged threat or conspiracy, if you will, goes back,

10   according to the government, 18 months.  I think that

11   there have been lots of opportunities for Mr. Faye to act

12   on these alleged beliefs.

13           And while he's continued to engage in this

14   kind of rhetoric and dialogue, the Court's not been

15   presented with any real evidence that he's taken

16   substantial steps toward accomplishing those things.

17   There may be beliefs or ideas or suspicions about that,

18   but, again, as Mr. Baker points out, we've got 18 months

19   of a whole lot of talking and not a whole lot of acting.

20   And so I think that that's an important consideration.

21           I think that the other piece to this that is

22   significant is what the role of the mental health issues

23   play in the decision as to whether or not there are

24   conditions that will reasonably assure the safety of the

25   community.  The mental health issue, I think, is

certainly argued by the parties in two different ways. I
think that the testimony of the witnesses and Mr. Baker's
argument suggests that his mental health issues are a
mitigating factor; while the government argues that they
are more of an aggravating factor.

Mr. Baker pointed out that folks with mental
health issues can sometimes say things that are really
off the wall -- it's not exactly what Mr. Baker said, but
that's the gist, I think. But what Mr. Baker doesn't
mention is the fact that mental health issues can often
cause people to do things that are off the wall and out
of the ordinary. And so that's the real concern I have
in this case. I think candidly that if -- if it wasn't
for the evidence about the defendant's mental health
issues, this might be a tough case for detention because
we've got 18 months of nothing. And certainly in that 18
months there have been lots and lots of opportunity.

But for the Court the way the mental health
issue plays into this equation is that the mental health
issues make it more unpredictable and unreliable to
predict what reaction Mr. Faye is going to have to these
situations. And the timeline of 18 months is in some
ways less significant to me in terms of analyzing the
condition of release issue than the timeline of November
to February the 5th.

1    I've got the testimony from Ms. Luebke about
2 her concerns escalating to the point where she had
3 Mr. Faye committed.  He was in a facility for a period,
4 he was diagnosed, he was put on medication, and then
5 returned home.  And during that time that he returned
6 home, it appears that maybe his firearms were taken from
7 him for a period of time but then returned to him.
8    And we've heard the statements about the
9 existence of this black vehicle and his concerns around
10 that.  We've also heard from the government that there
11 was no active surveillance of him at that time.  And that
12 sounds more consistent with what Ms. Luebke was talking
13 about in terms of him saluting trees and having these
14 conversations with imaginary people and things of that
15 nature, which suggests to me that maybe he had some sort
16 of a further break or some sort of a further issue after
17 his initial hospitalization.
18    And so I think that this issue of managing
19 his mental health is not as easy as it may appear to be.
20 It seems like it's a real challenge.  Again, that's also
21 consistent with the government's position about why they
22 went forward in the manner in which they did based upon
23 the changing nature of his dialogue in conversations, all
24 of which, again, suggests that there was some sort of an
25 ongoing mental health issue that may have been getting

1    worse rather than better following that hospitalization.

2              And so I have to ask, then, about these

3    conditions that the defendant suggests would be

4    appropriate in this case and whether they would

5    reasonably assure the safety of the community.  And the

6    conditions are essentially that he be on electronic

7    monitoring; that there be strict conditions; that

8    Ms. Pepper serve as a third-party custodian; that he

9    receive mental health treatment; and that he be

10   prohibited from accessing social media.

11             And I think that, again, having heard the

12   proof, I'm a little bit concerned about the efficacy of

13   those particular conditions as it relates to the mental

14   health issues.  Again, like the government, I have

15   absolutely no issue with Ms. Pepper or Ms. Luebke's

16   commitment here and their desire and willingness to be

17   helpful to Mr. Faye to address his mental health

18   conditions.  But I am concerned about their ability to do

19   so in an effective way.

20             Ms. Luebke is going to be at least 45

21   minutes away.  She's going to -- indicated she would do

22   what she could to assist.  She'd visit when she could,

23   she'd call to make sure that her mother was doing the

24   things that she agreed to do and that sort of thing.  And

25   Ms. Pepper has indicated that she would do what she could

as well.  And it's not in any way a criticism or critique
of either of them or their willingness or good faith
about what they want to do, but I'm not sure that I'm
satisfied that it's sufficient under the circumstances.

And those circumstances being that
notwithstanding this 18-month period of time when the
government alleges Mr. Faye was so obsessed with this
issue and he was communicating with multiple individuals
on multiple occasions about these topics, he was clearly
engaging with social media and other types of media to
determine information about politics, nobody in the
family seemed to know that was going on.

And, again, it's not a criticism of them.
It's understandable, particularly Ms. Pepper.  I mean,
she's in a really difficult situation with her ex-husband
and living in the same property.  And it's understandable
that she wouldn't -- No. 1, she said she's not interested
in those things.  And No. 2, she's not going to want to
get all up in his business about what he's thinking about
or what he's interested in and that sort of thing.

But, again, my concern is that if Mr. Faye's
mental health issues start to rise to the surface again
and he's -- it's just not realistic to think that I can
keep him 100 percent isolated from any of the issues that
are going on in the world, whatever the source is,

1  because it's so ubiquitous.

2      It's one of the real issues that we have is

3  the rhetoric, the political rhetoric that so often veers

4  toward imagery of war and conflict and fighting and those

5  sorts of things.  And there's some people who can accept

6  that as political rhetoric and they don't think anything

7  more of it or they don't want to engage in it.

8      But there are other folks like Mr. Faye,

9  apparently, who have that predisposition where they're

10 going to hear that in a different way than other people

11 did.  And it's clear based upon the arguments that have

12 been made by Mr. Baker and the statements that have been

13 made by the witnesses in this case, that Mr. Faye is

14 susceptible to those things.

15     And Ms. Pepper, understandably, is not

16 really in that good of a position to be able to address

17 those matters or deal with those matters if they come up.

18 And it's not really fair to her to put her in that

19 situation.  She's not a mental healthcare professional,

20 she didn't have that training, she doesn't have that

21 expertise.  And we've got a track record of Mr. Faye

22 keeping that information from her to begin with.

23     So I'm not really sure how we're going to

24 sprinkle the magic dust and all of a sudden now the

25 family who's made all these efforts and done the best

1  they can in the past and we still are where we are, I'm

2  going to be able to have confidence that we can

3  reasonably assure that those things won't happen in the

4  future.

5          And given the nature of the threats here,

6  given the nature of the danger that those situations

7  create, given the type of obsession that we've seen

8  Mr. Faye be able to have with these things and the fact

9  that none of these conditions, in my mind, would

10  reasonably assure that he wouldn't have those same

11  thoughts and wouldn't be in a position to be able to act

12  upon those things and given the unpredictability of his

13  mental health issues, I think create a greater danger

14  than they would in someone who didn't have those mental

15  health issues.

16          I'm just not satisfied that there are

17  conditions that will reasonably assure the safety of the

18  community.  And for those reasons, I'm going to grant the

19  government's motion and order that Mr. Faye remain

20  detained.

21          I am very concerned about his medication.

22  Mr. Kurtzman -- I'll say this aloud for the marshals as

23  well.  We're not going to be able to do much about mental

24  health treatment while he's in custody.  But he needs to

25  be getting his medication.  And if there continue to be

1  issues with that, Mr. Baker, I expect you'll bring those

2  back to me and I'll do what's necessary to make sure that

3  that happens.

4         MR. BAKER:  Yes.  I communicated with the

5  marshals last week on a daily basis.  I'm going to -- I'm

6  sure Mr. Withers will not be happy, but I'm going to let

7  him know again that it's still a problem and that he will

8  bring it -- I will also bring it to the Court's attention

9  if he's not getting his medication.

10         THE COURT:  All right, very good.  Thank

11  you.

12         Mr. Kurtzman, is there anything further from

13  the government's standpoint we need to address this

14  afternoon?

15         MR. KURTZMAN:  No, Your Honor.

16         THE COURT:  Mr. Baker, anything else for

17  your client today?

18         MR. BAKER:  No, Your Honor.  Thank you.

19         THE COURT:  All right.  Thank you all very

20  much.  We'll be in recess.  Good luck to you, Mr. Faye.

21         ***END OF ELECTRONIC RECORDING***

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Roxann Harkins, Official Court Reporter for

 4    the United States District Court for the Middle District

 5    of Tennessee, in Nashville, do hereby certify:

 6              That I transcribed from electronic recording

 7    the proceedings held on February 12, 2024, in the matter

 8    of UNITED STATES OF AMERICA v. PAUL FAYE, SR., Case No.

 9    3:24-mj-1036;

10          that said proceedings in connection with the

11    hearing were reduced to typewritten form by me; and that

12    the foregoing transcript is a true and accurate

13    transcript of said proceedings.

14

15          This is the 8th day of April, 2024.

16

17                    s/ Roxann Harkins____
                      ROXANN HARKINS, RPR, CRR
18                    Official Court Reporter

19

20

21

22

23

24

25
```